# REPORT OF PROCEEDINGS BY INVESTIGATING OFFICER/BOARD OF OFFICERS

For use of this form, see AR 15-6; the proponent agency is OTJAG.

*IF MORE SPACE IS REQUIRED IN FILLING OUT ANY PORTION OF THIS FORM, ATTACH ADDITIONAL SHEETS*

## SECTION I - APPOINTMENT

Appointed by [redacted]
*(Appointing authority)*

on 12 August 2003 *(Date)* *(Attach inclosure 1: Letter of appointment or summary of oral appointment data.) (See para 3-15, AR 15-6.)*

## SECTION II - SESSIONS

The *(investigation) (board)* commenced at Camp Victory, Baghdad Iraq *(Place)* at 0800D *(Time)*

on 12 AUG 2003 *(Date)* *(If a formal board met for more than one session, check here ☐. Indicate in an inclosure the time each session began and ended, the place, persons present and absent, and explanation of absences, if any.)* The following persons *(members, respondents, counsel)* were present: *(After each name, indicate capacity, e.g., President, Recorder, Member, Legal Advisor.)*

The following persons *(members, respondents, counsel)* were absent: *(Include brief explanation of each absence.) (See paras 5-2 and 5-8a, AR 15-6.)*

The *(investigating officer) (board)* finished gathering/hearing evidence at 1600D *(Time)* on 26 AUG 2003 *(Date)*

and completed findings and recommendations at 1600D *(Time)* on 29 AUG 2003 *(Date)*

## SECTION III - CHECKLIST FOR PROCEEDINGS

| A. COMPLETE IN ALL CASES | | YES | NO[1] | NA[2] |
|---|---|---|---|---|
| 1 | Inclosures *(para 3-15, AR 15-6)* | | | |
| | Are the following inclosed and numbered consecutively with Roman numerals: *(Attached in order listed)* | | | |
| | *a.* The letter of appointment or a summary of oral appointment data? | | | |
| | *b.* Copy of notice to respondent, if any? *(See item 9, below)* | X | | |
| | *c.* Other correspondence with respondent or counsel, if any? | | | X |
| | *d.* All other written communications to or from the appointing authority? | | | X |
| | *e.* Privacy Act Statements *(Certificate, if statement provided orally)?* | | | X |
| | *f.* Explanation by the investigating officer or board of any unusual delays, difficulties, irregularities, or other problems encountered *(e.g., absence of material witnesses)?* | | | X |
| | *g.* Information as to sessions of a formal board not included on page 1 of this report? | | | |
| | *h.* Any other significant papers *(other than evidence)* relating to administrative aspects of the investigation or board? | | | X |

FOOTNOTES: 1/ *Explain all negative answers on an attached sheet.*
2/ *Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.*

| | | YES | NO[1] | NA[2] |
|---|---|---|---|---|
| 2 | Exhibits *(para 3-16, AR 15-6)* | | | |
| | *a.* Are all items offered *(whether or not received)* or considered as evidence individually numbered or lettered as exhibits and attached to this report? | X | | |
| | *b.* Is an index of all exhibits offered to or considered by investigating officer or board attached before the first exhibit? | X | | |
| | *c.* Has the testimony/statement of each witness been recorded verbatim or been reduced to written form and attached as an exhibit? | X | | |
| | *d.* Are copies, descriptions, or depictions *(if substituted for real or documentary evidence)* properly authenticated and is the location of the original evidence indicated? | | | X |
| | *e.* Are descriptions or diagrams included of locations visited by the investigating officer or board *(para 3-6b, AR 15-6)*? | | | X |
| | *f.* Is each written stipulation attached as an exhibit and is each oral stipulation either reduced to writing and made an exhibit or recorded in a verbatim record? | | | X |
| | *g.* If official notice of any matter was taken over the objection of a respondent or counsel, is a statement of the matter of which official notice was taken attached as an exhibit *(para 3-16d, AR 15-6)*? | | | X |
| 3 | Was a quorum present when the board voted on findings and recommendations *(paras 4-1 and 5-2b, AR 15-6)*? | | | X |
| **B.** | **COMPLETE ONLY FOR FORMAL BOARD PROCEEDINGS** *(Chapter 5, AR 15-6)* | | | |
| 4 | At the initial session, did the recorder read, or determine that all participants had read, the letter of appointment *(para 5-3b, AR 15-6)*? | | | |
| 5 | Was a quorum present at every session of the board *(para 5-2b, AR 15-6)*? | | | |
| 6 | Was each absence of any member properly excused *(para 5-2a, AR 15-6)*? | | | |
| 7 | Were members, witnesses, reporter, and interpreter sworn, if required *(para 3-1, AR 15-6)*? | | | |
| 8 | If any members who voted on findings or recommendations were not present when the board received some evidence, does the inclosure describe how they familiarized themselves with that evidence *(para 5-2d, AR 15-6)*? | | | |
| **C.** | **COMPLETE ONLY IF RESPONDENT WAS DESIGNATED** *(Section II, Chapter 5, AR 15-6)* | | | |
| 9 | Notice to respondents *(para 5-5, AR 15-6)*: | | | |
| | *a.* Is the method and date of delivery to the respondent indicated on each letter of notification? | | | |
| | *b.* Was the date of delivery at least five working days prior to the first session of the board? | | | |
| | *c.* Does each letter of notification indicate -- | | | |
| | (1) the date, hour, and place of the first session of the board concerning that respondent? | | | |
| | (2) the matter to be investigated, including specific allegations against the respondent, if any? | | | |
| | (3) the respondent's rights with regard to counsel? | | | |
| | (4) the name and address of each witness expected to be called by the recorder? | | | |
| | (5) the respondent's rights to be present, present evidence, and call witnesses? | | | |
| | *d.* Was the respondent provided a copy of all unclassified documents in the case file? | | | |
| | *e.* If there were relevant classified materials, were the respondent and his counsel given access and an opportunity to examine them? | | | |
| 10 | If any respondent was designated after the proceedings began *(or otherwise was absent during part of the proceedings)*: | | | |
| | *a.* Was he properly notified *(para 5-5, AR 15-6)*? | | | |
| | *b.* Was record of proceedings and evidence received in his absence made available for examination by him and his counsel *(para 5-4c, AR 15-6)*? | | | |
| 11 | Counsel *(para 5-6, AR 15-6)*: | | | |
| | *a.* Was each respondent represented by counsel? | | | |
| | Name and business address of counsel: | | | |
| | | | | |
| | *(If counsel is a lawyer, check here ☐ )* | | | |
| | *b.* Was respondent's counsel present at all open sessions of the board relating to that respondent? | | | |
| | *c.* If military counsel was requested but not made available, is a copy *(or, if oral, a summary)* of the request and the action taken on it included in the report *(para 5-6b, AR 15-6)*? | | | |
| 12 | If the respondent challenged the legal advisor or any voting member for lack of impartiality *(para 5-7, AR 15-6)*: | | | |
| | *a.* Was the challenge properly denied and by the appropriate officer? | | | |
| | *b.* Did each member successfully challenged cease to participate in the proceedings? | | | |
| 13 | Was the respondent given an opportunity to *(para 5-8a, AR 15-6)*: | | | |
| | *a.* Be present with his counsel at all open sessions of the board which deal with any matter which concerns that respondent? | | | |
| | *b.* Examine and object to the introduction of real and documentary evidence, including written statements? | | | |
| | *c.* Object to the testimony of witnesses and cross-examine witnesses other than his own? | | | |
| | *d.* Call witnesses and otherwise introduce evidence? | | | |
| | *e.* Testify as a witness? | | | |
| | *f.* Make or have his counsel make a final statement or argument *(para 5-9, AR 15-6)*? | | | |
| 14 | If requested, did the recorder assist the respondent in obtaining evidence in possession of the Government and in arranging for the presence of witnesses *(para 5-8b, AR 15-6)*? | | | |
| 15 | Are all of the respondent's requests and objections which were denied indicated in the report of proceedings or in an inclosure or exhibit to it *(para 5-11, AR 15-6)*? | | | |

FOOTNOTES: 1/ *Explain all negative answers on an attached sheet.*
2/ *Use of the N/A column constitutes a positive representation that the circumstances described in the question did not occur in this investigation or board.*



USAPA V1.2

**SECTION IV - FINDINGS** *(para 3-10, AR 15-6)*

The *(investigating officer) (board)*, having carefully considered the evidence, finds:

a. The INMARSAT terminals in question are the terminals received by the [redacted] Terminals identified as:

b. receiver sn# 76EB72815D89 // associated SIM - 800852748760

c. receiver sn# 76EB722E34D9 // associated SIM - 800852A8EBBE

d. The invoice tracks the calls via the SIM serial number.

e. Cost for voice phone call = $2.49/min

f. Cost for data connectivity/internet = $7.69/min

g. Terminal # 800852748760 made 2041 phone calls and 1149 internet sessions over a 31 day period.

h. Terminal 800852A8EBBE made 2864 phone calls and 1200 internet sessions over the 31 day period.

i. After weighing the evidence [statements from the principles involved] the investigating officer finds that the greater weight of evidence lies with the personnel from the [redacted] and that the Department of State DART team did not fully communicate the parameters of use of the INMARSAT systems to the [redacted]

j. [redacted] principles [redacted] repeatedly asked the question - whether morale calls were permitted and the response they received/perceived from the DART team was "yes".

k. The Investigating Officer finds that the DART Team assumed that the INMARSATs would be used in a responsible manner.

l. The Investigating Officer finds that when the terminals were turned over from the DART Team to the [redacted] [roughly 1: APR and 1 MAY] the pilot period for free usage [donated airtime from Telenor] was ending on roughly 10 May.

**SECTION V - RECOMMENDATIONS** *(para 3-11, AR 15-6)*

In view of the above findings, the *(investigating officer) (board)* recommends:

a. A simple recommendation to preclude this from happening again would be to deny units from receiving any ad-hoc external communications support. This might prevent this type of event from happening again, but it might also deny much-needed communication support for CA units.

b. The Investigating Officer recommends that CA units receiving ad-hoc external support from either governmental organizations, NGOs, or the commercial / business domain develop a written letter of agreement clearly articulating the limits of use, financial responsibilities and who is responsible for proper system use. Clear and unambiguous communications is essential for proper system use.

c. The Investigating officer finds that the bill incurred with this usage should not be borne by the [redacted] but rather by the Department of State.

**SECTION VI - AUTHENTICATION** *(para 3-17, AR 15-6)*

THIS REPORT OF PROCEEDINGS IS COMPLETE AND ACCURATE. *(If any voting member or the recorder fails to sign here or in Section VII below, indicate the reason in the space where his signature should appear.)*

[redacted] 29 APR 03

*(Recorder)* *(Investigating Officer)* ~~*(President)*~~

*(Member)* *(Member)*

*(Member)* *(Member)*

**SECTION VII - MINORITY REPORT** *(para 3-13, AR 15-6)*

To the extent indicated in Inclosure ________, the undersigned do(es) not concur in the findings and recommendations of the board. *(In the inclosure, identify by number each finding and/or recommendation in which the dissenting member(s) do(es) not concur. State the reasons for disagreement. Additional/substitute findings and/or recommendations may be included in the inclosure.)*

*(Member)* *(Member)*

**SECTION VIII - ACTION BY APPOINTING AUTHORITY** *(para 2-3, AR 15-6)*

The findings and recommendations of the *(investigating officer)* ~~*(board)*~~ are *(approved)* ~~*(disapproved) (approved with following exceptions/substitutions)*~~. *(If the appointing authority returns the proceedings to the investigating officer or board for further proceedings or corrective action, attach that correspondence (or a summary, if oral) as a numbered inclosure.)*

State Department should pay this bill. State Department borrowed the equipment from a commercial firm for use in a USAID Disaster Assistance Response Team pilot program. State Department then further loaned the equipment to an Army unit without permisison of the owner, clear accountablity, or unambiguous guidance as to use.

[redacted] 11 SEP 2003

August 15, 2003

TO: [redacted] Baghdad, Iraq

FROM: [redacted] US Department of State

SUBJECT: Investigation into the [redacted] use of Telenor equipment

Sir:

I was the individual on the USAID Disaster Assistance Response Team (DART) who turned over the INMARSAT systems to the [redacted] I am not an AID employee, but a foreign affairs officer in the US State Department's Bureau of Intelligence and Research. I was seconded to the Iraq DART from mid-March through the end of May 2003.

Regarding the questions involving the communications equipment in your memorandum of August 11:

1. Who from [redacted] received the instruments?

The first of these INMARSAT systems was entrusted to [redacted] of the [redacted] in mid-April. After consulting with GRT, this system was given to the [redacted] BDE in Kuwait just before it deployed to Baghdad. With the DART not deploying because the security environment at that time was not permissive, this INMARSAT system was turned over to the [redacted] to expedite reporting of the humanitarian situation in and around Baghdad. The second system was turned over to [redacted] and [redacted] at the end of April after they informed me that the INMARSAT system I had given to [redacted] in mid-April was proving to be a valuable asset to the [redacted] in Baghdad. Both systems were loaned to the [redacted] BDE to assist in the humanitarian reporting process and for use in the event of an emergency situation (During the first few weeks of the [redacted] deployment in Iraq, I remained in Kuwait, awaiting permission to forward deploy).

2. What were the instructions given by the USAID personnel to the [redacted] in terms of usage of the systems? What limitations [if any] were conveyed to the [redacted] What was deemed authorized usage?

[redacted] were trained on how to operate the equipment, how to complete the pre-configured Rapid Assessment Form (RAF) templates that were designed by the United Nations Office of the Coordinator of Humanitarian Affairs to facilitate humanitarian reporting, and where to send the forms upon completion. I explained that these systems were part of a pilot project and that the satellite usage was a donation of the Norwegian government/Telenor for the support of the humanitarian effort. I emphasized that satellite use was to be exclusively related to

ENCL I

humanitarian operations, and these systems should in no way be utilized in support of combat operations. In this context, it was certainly clear that personal use of these systems (e.g., for voice calls home or "surfing" the Internet) was not authorized.

3. Was there a period of usage stated? – eg [redacted] you can use these systems wide open till whenever?

Since I was responsible for bringing a total of four INMARSAT sets back to Washington, DC, I conveyed to [redacted] that the period of usage for the [redacted] BDE was considered until the end of my rotation.

4. Was there any discussion of who was going to pay the bill for usage?

There was no discussion of paying for satellite usage. As I made clear when the systems were loaned to [redacted] the satellite capacity was being donated to support humanitarian operations, and usage was to be limited to such operations (see answer to Question 2).

5. What was the purpose /intent for turning over these systems to the [redacted]

These systems were part of a pilot project to test satellite transmission of georeferenced data during humanitarian crises between the field and headquarters-level consumers. Since the DART was prevented from entering Iraq due to ongoing combat operations, these systems were offered to the [redacted] to facilitate this reporting process; not only would information on humanitarian conditions be expedited back to Washington, DC and among agencies in the field, but this also would be an opportunity for the [redacted] BDE to create a more robust database of humanitarian assessments.

6. What was conveyed to the [redacted] in terms of final disposition of the equipment? – eg after [redacted] departs theater – what does [redacted] do with the equipment?

[redacted] and [redacted] assured me that if one of my DART colleagues or I were unable to retrieve the systems from them in Baghdad, then arrangements could be made to have them sent back to Kuwait before I departed the region.

7. Why didn't the USAID team return the INMARSAT systems back to Telenor after the pilot program was complete ~ 10 May 2003?

The two INMARSAT systems were left in Baghdad with the [redacted] because [redacted] assured me that the [redacted] was preparing to purchase the equipment with the assistance of OSD/SOLIC. In order to continue using these systems for reporting on humanitarian conditions, I left the two sets with the [redacted] after consulting with GRT since the DART participation in this pilot project was ending and because [redacted] had informed me that the [redacted] budget and finance officer was arranging for a purchase through SOLIC. Upon completion of my rotation in Iraq on May 31, I

transported the remaining two INMARSAT systems back to Washington, DC for delivery back to Telenor in early June.

8. Was there a period where the USAID team was co-located with the [redacted] – and the [redacted] personnel could observe the USAID usage of the system?

During my time in Baghdad, the USAID team was located about a mile from the [redacted] BDE, and I know of no time that [redacted] personnel would have observed DART usage of the system.

Please let me know if I can be of any further assistance.

Respectfully,

[redacted]

T