IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TELENOR SATELLITE SERVICES, INC., Plaintiff, v. UNITED STATES, Defendant. | No. 05-528C Baskir, J. |

TELENOR'S PROPOSED FINDINGS OF
UNCONTROVERTED FACT IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT RE AUTHORITY

Pursuant to RCFC 56(h)(1), Telenor, for its Proposed Findings of Uncontroverted Fact in Support of its Motion for Partial Summary Judgment re Authority, states as follows:

1. For their mutual benefit, Telenor delivered to the Department of State satellite communications equipment to allow high-speed data and voice satellite communications, at no charge, for humanitarian purposes to support the USAID Disaster Assistance Response Team (DART) pilot program in Iraq for two months. (Complaint ¶ 1; Answer ¶ 1.)

2. Telenor and the Department of State entered into terms for this bailment expressed in a letter dated March 12, 2003 (attached as Attachment A), from Mr. Reid A. Daugherity of the Department of State,

Bureau for Intelligence and Research, to Ms. Britt Carina Horncastle, President of Telenor. (Complaint ¶ 5; Answer ¶ 5; Affidavit of Lawrence Paul, attached as Attachment B, ¶ 8 except ¶¶ 4, 5.)

3. The letter from Mr. Daugherity provided that the specified Telenor equipment (four GAN terminals) would be used for a two-month DART pilot program commencing mid-March 2003 "to demonstrate and verify the feasibility of utilizing mobile satellite communication technology to improve coordination of global disaster recovery and reconstruction efforts of government and non-governmental organizations." (Attachment A.)

4. The March 12 letter also stated as follows: "Telenor must authorize any other use of the GAN terminals for purposes other than what has been stipulated in the two-month DART pilot program. In the event that the terminals should be used for other purposes, Telenor will provide service to the user at agreed upon service rates." (Attachment A.)

5. The Department of State took possession of the Telenor equipment and installed it in Iraq. (Complaint ¶ 8; Answer ¶ 8; Paul Affidavit, Attachment B, ¶ 7.)

6. In April and May 2003, the State Department, in conjunction with the Army's 354th Civil Affairs Brigade, utilized the equipment to

transmit "short-burst" communications in furtherance of the DART pilot program. (Complaint ¶ 8; Answer ¶ 8.)

7. Upon conclusion of the authorized use in May 2003 for the DART pilot program, the State Department left two Telenor terminals in the possession of the Army. (Complaint ¶ 9; Answer ¶ 9.)

8. For some period during May through June 10, 2003, representatives of the Army used Telenor's equipment for voice and data transmissions other than in support of the DART program.[1] (Complaint ¶ 10; Answer ¶ 10.)

9. When Telenor discovered this unauthorized use, it shut off the transmission capability of the equipment by June 11, 2003. (Complaint ¶ 10; Answer ¶ 10.)

10. In June 2003, Telenor invoiced the State Department, at Telenor's standard published service rates, for satellite telecommunications services provided for other than the DART pilot program. The State Department did not pay the invoice. (Complaint ¶ 11; Answer ¶ 11; Paul Affidavit, Attachment B, ¶ 8.)

---

[1] This was done without Telenor's knowledge or consent, but that fact is not material for purposes of the motion which these uncontroverted facts support.

11. On May 11, 2004, Telenor's General Counsel, Barbara L. Spencer, and its Director, Business Development, Lawrence Paul, met with State Department counsel, Mr. Dennis J. Gallagher. The Telenor representatives said that the amounts involved for the unauthorized use were too large for Telenor to ignore and that Telenor hoped to be able to avoid suing the agency over the matter with Mr. Gallagher's assistance. Mr. Gallagher said he would investigate the matter and respond with the position of the State Department. (Paul Affidavit, Attachment B, ¶ 8.)

12. By letter dated June 9, 2004, from Mr. Gallagher to Ms. Spencer (attached as Attachment C), Mr. Gallagher stated in part as follows:

> Following my meeting with you and Larry Paul on May 11, I have attempted to determine the position of the Department of State with respect to the excessive use of Nera Immarset [sic] GAN terminals loaned by Telenor to Reid A. Daugherity, a civil service employee of the Department of State.
>
> I have met with Mr. Daugherity and with Leona Coulombe, the Executive Director of the Bureau for Intelligence and Research where Mr. Daugherity is employed. My discussions with them confirms [sic] my understanding that Mr. Daugherity was acting at all times in good faith and within the scope of his employment with the Department of State. I have found no reason to question Mr. Daugherity's actual authority to sign the letter of March 12, 2003 to Ms. Horncastle . . . .

13. The Department of State position description of Mr. Daugherity (Attachment D) reads in relevant part as follows:

Foreign Affairs Research Analyst, GS-0130-14

. . . .

Primary Purpose: The incumbent of this position is an expert foreign affairs intelligence analyst responsible for providing all-source intelligence analysis on complex humanitarian emergencies and natural disasters, including contingency planning, implementing response mechanisms, managing interagency information sharing, and conducting comparative assessments. This position will serve as a deputy division chief of a unit with the responsibility for both interagency liaison functions and managing a small staff of analysts.

. . . .

2.) Represents Bureau or Department 20%

***Participates actively in bilateral and multilateral negotiations and information exchanges and provides authoritative intelligence assessments and related information to delegation heads and senior officials. . . .*** Areas of expertise include both man-made and natural disaster, emergency response, civil-military relations and coordination mechanisms, support for diplomacy abroad, population displacements, and the field-based coordination of geographic information databases.

. . . Serves as a primary point of contact with the Office of the Secretary and as a ***direct focal point in the Department on all matters relating to area of expertise.*** . . .

. . . .

3.) Serves as Bureau's or Department's Action Office [sic] 20%

***Serves as the Department's lead officer in implementing intelligence support for a treaty or agreement on one or more complex, highly sensitive programs involving global, regional and country-specific issues.***

Areas of responsibility include managing the U.S. Governments' [sic] interagency coordination of humanitarian information . . . .

. . . .

4.) Advises Departmental and USG Policymaking Officials and Staffs 20%

. . . .

Areas of responsibility include . . . working with other U.S. Government technical agencies on standards and new technologies related to the mitigation of and response to complex humanitarian emergencies.

. . . Initiates and develops, personally or through the efforts of others, briefings and follow-up meetings involving key officials from other bureaus, other agencies, Congressional staff, or special interest groups.

Factor 1-8 . . .
Knowledge Required by the Position

. . . .

Skill in oral and written communication to prepare and defend analyses, provide guidance, solicit information, defend proposals, and negotiate agreements.

Factor 2-5 . . .
Supervisory Controls

. . . .

Assumes responsibility for planning, coordinating, and carrying out projects and informs the supervisor as appropriate.

. . . .

Factor 5-5 . . .
Scope and Effect

> . . . The scope of the assignment area is substantial and includes: . . . planning and carrying out special research studies that address critical issues of broad scope and impact. . . .
>
> Factor 6-3 . . .
> Personal Contacts
>
> Contacts are with Bureau employees at all levels, including the Assistant Secretary, policy analysts and managers in other bureaus; personnel at US posts worldwide; senior analysts and officials in other agencies; congressional staff; experts, consultants, researchers, and educators in the specialty field; and officials of non-governmental organizations. Contacts occur in a wide variety of planned/unplanned, formal/informal settings . . . .
>
> Factor 7-3 . . .
> Purpose of Contacts
>
> Contacts are to exchange information, present analyses, provide guidance, plan[,] organize, and coordinate activities, establish liaison, represent the Bureau, resolve problems, and respond to urgent developments. . . .
>
> . . . .

(Emphasis in original.)

14. Mr. Daugherity kept his supervisors, including the Deputy Assistant Secretary for Analysis and Information Management, Mr. William Wood, informed of the DART project with Telenor. Mr. Wood approved the project. (Paul Affidavit, Attachment B, ¶¶ 3, 6.)

15. Mr. Paul of Telenor met with Mr. Daugherity and Mr. Wood shortly after Mr. Daugherity executed the March 12, 2003, letter (Attachment A). Mr. Wood expressed to Mr. Paul his knowledge and

approval of the DART pilot program and Telenor's participation in that program as set out in the March 12 letter. (Paul Affidavit, Attachment B, ¶ 8.)

Respectfully submitted,

__s/Frederick W. Claybrook, Jr._____
Frederick W. Claybrook, Jr.
(Counsel of Record)

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500

Of Counsel

Barbara L. Spencer, Esq.
General Counsel
Telenor Satellite Services, Inc.
1101 Wootton Parkway, 10th Floor
Rockville, Maryland 20852

December 2, 2005

DCIWDMS: 2669703_1