IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TELENOR SATELLITE SERVICES, INC., Plaintiff, | ) | |
| v. | ) | No. 05-528C (Baskir, J.) |
| UNITED STATES, Defendant. | ) | |

APPENDIX IN SUPPORT OF TELENOR'S MOTION FOR SUMMARY JUDGMENT RE AUTHORITY AND IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Frederick W. Claybrook, Jr.
(Counsel of Record)

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500

Of Counsel

Barbara L. Spencer, Esq.
General Counsel
Telenor Satellite Services, Inc.
1101 Wootton Parkway, 10th Floor
Rockville, Maryland 20852

January 31, 2006

# TABLE OF CONTENTS

TAB

1 March 12, 2003, letter from Reid A. Daugherity to Britt Horncastle

2 June 9, 2004, letter from Dennis J. Gallagher to Barbara L. Spencer

3 DOS Position Description for Foreign Affairs Research Analyst, GS-0130-14

4 Affidavit of Lawrence Paul, dated December 1, 2005

5 Second Affidavit of Lawrence Paul, dated January 30, 2006

6 Rule 56(f) Affidavit of Frederick W. Claybrook, Jr., dated January 25, 2006

7 Excerpts from DOS Foreign Affairs Manual and Handbook

1

**United States Department of State**

*Washington, D.C. 20520*

March 12, 2003

Dear Ms. Horncastle,

This is to confirm receipt and provisos of operations regarding all equipment provided by Telenor for the USAID Disaster Assistance Response Team (DART) pilot program. The four Nera Inmarsat GAN terminals (GAN terminal IDs: 76EB72852062, 76EB72B97A87, 76EB722E34D9, 76EB72815D89) will be used for a two-month pilot program that will commence on or about the third full week of March 2003. SIM cards also provided are as follows: 800852D7EBAA, 800852A8EBBE, 800852C8D42C, 800852748760.

Operation of these terminals is intended to demonstrate and verify the feasibility of utilizing mobile satellite communication technology to improve coordination of global disaster recovery and reconstruction efforts of governments and non-governmental organizations. This demonstration is a cooperative and joint effort sponsored and proposed by Global Relief Technologies, Panasonic, ESRI, and Telenor.

Telenor must authorize any other use of the GAN terminals for purposes other than what has been stipulated in the two-month DART pilot program. In the event that the terminals should be used for other purposes Telenor will provide service to the user at agreed upon service rates.

Sincerely,

Reid A. Daugherity

Reid A. Daugherity

2

**United States Department of State**

*Washington, D.C. 20520*

June 9, 2004

VIA U.S. MAIL
Ms. Barbara L. Spencer
Telenor Satellite Service Holdings, Inc.
1101 Wootton Parkway, 10th Floor
Rockville, MD 20852

Re: Claim for Use of Nera IMMARSAT GAN Terminals

Dear Ms. Spencer:

Following my meeting with you and Larry Paul on May 11, I have attempted to determine the position of the Department of State with respect to the excessive use of Nera Immarsat GAN terminals loaned by Telenor to Reid A. Daugherity, a civil service employee of the Department of State.

I have met with Mr. Daugherity and with Leona Coulombe, the Executive Director of the Bureau for Intelligence and Research where Mr. Daugherity is employed. My discussions with them confirms my understanding that Mr. Daugherity was acting at all times in good faith and within the scope of his employment with the Department of State. I have found no reason to question Mr. Daugherity's actual authority to sign the letter of March 12, 2003 to Ms. Horncastle, and believe it would be fair to conclude that Mr. Daugherty received the four Nera Immarsat GAN terminals for official purposes in a transaction that could reasonably be characterized either as a gratuitous bailment for mutual benefit or possibly as a gratuitous bailment for the benefit of the bailee. Mr. Daugherity received the GAN terminals for use by the USAID Disaster Assistance Response Team (DART) pilot program, and Telenor's motive in loaning the equipment and providing limited free satellite connect time was to assist a humanitarian effort and possibly also to demonstrate the usefulness of its product in transmitting data from remote locations.

In accepting the loan of the equipment, Mr. Daugherity would appear to have been under a duty to use the equipment with reasonable case. It appears to the Department, however, that he did so. Mr. Daugherity did permit two of the GAN terminals to come into the possession of the 354th Civil Affairs Brigade of the United States Army and did leave these terminals in the possession of that military unit when he left Iraq. He did so, however, only after consulting with and obtaining the approval of Michael D. Gray, CEO of Global Relief Technologies. Mr. Gray arranged the furnishing of the GAN terminals by Telenor in the first instance and apparently acted as its representative. With respect to leaving the two terminals with the 354th Civil Affairs Brigade, Mr. Gray advised Mr. Daugherity that he had obtained the approval of Ms. Britt-Carina Horncastle, Telenor's President.

Accordingly, the Department of State believes that Mr. Daugherity did not breach his duty to Telenor, and that the Department of State therefore does not bear responsibility for the excessive use of the terminals. Please let us know if we can provide further information.

Sincerely yours,

Dennis J. Gallagher

Dennis J. Gallagher
Assistant Legal Adviser
Buildings and Acquisitions
Tel. 703-516-1543
FAX 703-516-1547

3

Foreign Affairs Research Analyst, GS-0130-14

Position Number:
Organizational Code: 064620
Organizational Location: **This position is located in the Office of The Geographer and Global Issues, Bureau of Intelligence and Research.**

Primary Purpose: The incumbent of this position is an expert foreign affairs intelligence analyst responsible for providing all-source intelligence analysis on complex humanitarian emergencies and natural disasters, including contingency planning, implementing response mechanisms, managing interagency information sharing, and conducting comparative assessments. This position will serve as a deputy division chief of a unit with the responsibility for both interagency liaison functions and managing a small staff of analysts.

Incumbent represents the Department in interagency meetings, provides guidance to Department policymakers, briefs members of Congress, and serves as an expert in various intergovernmental and non-governmental fora.

Incumbent advises on and performs research and other professional work in support of the formulation and direction of US foreign policy and bearing on US relations with foreign governments and international organizations.

Evaluates information and initiates research bearing on the implementation of existing and proposed policies.

1.) Performs Analysis in Support of Policy Development and Implementation 40%
Continuously assesses developments bearing on the political viability of options and alternatives concerning ongoing issues in complex humanitarian emergencies and interagency information sharing and dissemination, and develops innovative approaches for the analysis of complex political, military, social, and other issues. ***As a recognized expert in his/her field by the Department and other Federal agencies, drafts, presents, and defends policy-relevant intelligence analyses for Departmental and other Federal officials.*** Demonstrates a high level of analytical ability in using intelligence-derived insights to advise decision makers. Serves as the Bureau's recognized expert who analyzes a variety of issues which are critical to the development of policy and the operational support of Department-wide initiatives. ***Develops original and independent intelligence analyses bearing on highly controversial and politically sensitive US positions. Anticipates potential policy problems, assesses impact and Congressional reaction,*** and ensures that policy recommendations are informed by thorough and objective analysis of all relevant intelligence.



Tel. Appx. 4

2.) Represents Bureau or Department 20%
*Participates actively in bilateral and multilateral negotiations and information exchanges and provides authoritative intelligence assessments and related information to delegation heads and senior officials. Actively participates in or chairs interagency working groups preparing intelligence analyses and assessments bearing on US positions.* Areas of expertise include both man-made and natural disaster, emergency response, civil-military relations and coordination mechanisms, support for diplomacy abroad, population displacements, and the field-based coordination of geographic information databases.

Works with experts in other agencies to develop intelligence-based assessments bearing on policy proposals. Conducts studies, develops alternative interpretations, and prepares finished assessments for interagency consideration and briefs other agencies on findings. Serves as a primary point of contact with the Office of the Secretary and as a *direct focal point in the Department on all matters relating to area of expertise. Provides briefings and written products to top management officials and serves as liaison with key Bureau staff* and with counterparts and experts in other Bureaus.

Effectively manages assigned programs. Maintains currency in new developments in the field and accurately projects the impact of same on programs. Ensures effective execution of program requirements by self and subordinates. Establishes systematic methods of program execution, evaluation or advocacy.

3.) Serves as Bureau's or Department's Action Office 20%
*Serves as the Department's lead officer in implementing intelligence support for a treaty or agreement on one or more complex, highly sensitive programs involving global, regional and country-specific issues.*

Areas of responsibility include managing the U.S. Governments' interagency coordination of humanitarian information, driving the declassification of databases for broader dissemination to the field, providing a liaison with UN and NGO elements with roles in complex emergency response, and managing a staff of analysts dedicated to issues related to humanitarian emergency contingency planning and response.

Establishes strategic goals and objectives for intelligence support, proposes new approaches and components, analyzes resource implications, and advocates acquisition of budget and staff resources needed for implementation. Provides intelligence-based program and planning guidance to officers charged with implementing the program. Conducts site visits overseas to collect information on problems and possible solutions in program implementation. Drafts, clears, and issues analyses, assessments, and other materials for the use of posts and geographic bureaus in program implementation. Provides follow-up assistance as required.

4.) Advises Departmental and USG Policymaking Officials and Staffs 20%
*Advises bureau Deputy Assistant Secretary, Assistant Secretary, appropriate Under Secretaries, and other senior managers and staff on program issues and problems arising from intelligence information and assessments. Serves as principal advisor for intelligence matters in bilateral and multilateral meetings where program issues are negotiated.*

Areas of responsibility include preparing documents for briefing senior policy makers, including maps and web-based databases, surveying cables and other ext-based documents for the purpose of graphic presentation, and working with other U.S. government technical agencies on standards and new technologies related to the mitigation of and response to complex humanitarian emergencies.

Represents the Department in resolving intelligence issues and disputes in interagency working group meetings. Plans and coordinates intelligence support to program implementation among multiple agencies, bureaus, and posts. Initiates and develops, personally or through the efforts of others, briefings and follow-up meetings involving key officials from other bureaus, other agencies, Congressional staff, or special interest groups.

Factor 1-8 1550 Points
Knowledge Required by the Position

Advanced knowledge of the theories and principles of political science, international relations, economics, history, geography, or other related disciplines applied in analyzing and evaluating factors involved in the administration of US foreign policy programs.

Advanced facility with social science methods and techniques to produce policy relevant assessments that involve the research and analysis of information derived from a variety of sources.

Command of one or more geographic or functional specialty areas to provide expert advice and guidance with respect to the policy implications of issues and developments in the assigned specialty area.

Knowledge of current US foreign policy objectives and programs to assess the relevance and implications of global social, political, economic, geographic, and military issues, developments, and events affecting the formulations and execution of US foreign policy, and to recommend intelligence collection programs in the assigned specialty area.

Command of US foreign affairs information sources, processes, and organizations in order to apply the full range of available information resources and capabilities in supporting the needs of the Department.

Expert knowledge of Department goals, objectives, programs, and relationships to provide expert analytical and advisory services that are responsive to the specialized needs of the organizations supported.

Ability to provide advice, guidance, and consultation to senior officials with regard to the interpretation and application of analyses.

Ability to establish liaison at all levels throughout the foreign policy and intelligence communities to exchange information vital to both spheres of operation.

Skill in oral and written communication to prepare and defend analyses, provide guidance, solicit information, defend proposals, and negotiate agreements.

Factor 2-5 650 Points
Supervisory Controls

The supervisor typically provides general substantive guidance and administrative direction. Overall assignments are made in terms of broadly defined functions or the employing organization. Specific assignments frequently originate out of the liaison activities of the work, and the officer independently negotiates the scope and objectives of projects with the policymaker or staff, subject to general agency policies and operating requirements.

Assumes responsibility for planning, coordinating, and carrying out projects and informs the supervisor as appropriate.

Is recognized as an authoritative professional in a particular field within the agency. The work is generally considered to be technically accurate and is often not subjected to detailed substantive review. Substantive review by peers, where appropriate, is usually initiated by the incumbent. Work products are examined for compliance with broad standards of rigorous scholarship.

Factor 3-5 650 Points
Guidelines

The officer must exercise a high degree of judgment in interpreting and adapting existing precedents and in developing new or improved approaches to analyze, develop, and present authoritative information or analysis on controversial subjects to persons with conflicting views. The methods and procedures developed often serve as precedents for others.

Factor 4-5 325 Points
Complexity

The assignment involves providing expert analytical and advisory support—often on an unrehearsed and ad hoc basis—for the planning, development, and execution of US foreign policy within a broad and complex geographic or functional specialty area. The work requires applying a rigorous analytical approach to data that is often vague, unsubstantiated, or contradicts existing knowledge. The same approach must be applied to developing analyses that provide new perspectives for the understanding of complex political, military, economic, social, or geographic issues in the specialty area.

The work is complicated by the need to provide expert advice and guidance that influences the decisions and actions of senior policy officials and the need to quickly, accurately, and decisively determine the relevance and significance of information to the policy interests of the Department. It is further complicated by the need to produce widely disseminated analytical products that represent the Bureau's official assessment of complex issues, and keep the policymaking and foreign affairs communities constantly apprised of new issues and developments in the specialty area.

Other complicating factors include the incumbent's responsibility for coordinating Bureau contributions to interagency projects, for ascertaining the need for initiating and conducting in-depth studies on topics of critical importance to the policy formulation process, and for representing the Bureau on committees and working groups that address issues of vital interest to the Bureau/Department. The assignment also involves identifying, developing, and recommending improved methods and approaches to the research and analysis process.

Factor 5-5 325 Points
Scope and Effect

The purpose of the work is to provide expert foreign affairs intelligence analysis and advisory services within a broad and complex geographic or functional area that supports the planning, development, and execution of US foreign policy. The scope of the assignment area is substantial and includes: defining information requirements; monitoring and reporting on important global developments; analyzing complex political, military, economic, and social issues; providing guidance to policymakers in interpreting and applying data; establishing and maintaining productive relationships within the foreign affairs and intelligence communities; and planning and carrying out special research studies that address critical issues of broad scope and impact. The services provided by the incumbent contribute in a significant fashion to the accomplishment of key foreign policy objectives by producing valid, reliable, time sensitive analyses of vital issues that enable policy makers to reach informed foreign policy decisions. The incumbent's efforts also result in the development of improved methods and approaches

and the establishment of productive relationships with the foreign affairs and intelligence communities.

Factor 6-3 60 Points
Personal Contacts

Contacts are with Bureau employees at all levels, including the Assistant Secretary, policy analysts and managers in other bureaus; personnel at US posts worldwide; senior analysts and officials in other agencies; congressional staff; experts, consultants, researchers, and educators in the specialty field; and officials of non-governmental organizations. Contacts occur in a wide variety of planned/unplanned, formal/informal settings, including open meetings and conferences where the incumbent may be called upon to explain and defend Bureau's products and positions.

Factor 7-3 120 Points
Purpose of Contacts

Contacts are to exchange information, present analyses, provide guidance, plan organize, and coordinate activities, establish liaison, represent the Bureau, resolve problems, and respond to urgent developments. A high degree of persuasiveness is required to gain acceptance of highly consequential analytical judgments, to defend recommendations for significant changes in established analytical methods, and to overcome resistance in reaching consensus on controversial issues.

Factor 8-1 5 Points
Physical Demands

The work generally does not impose unusual physical demands on the incumbent. Periodic travel of varying duration to posts worldwide may be required.

Factor 9-1 5 Points
Work Environment

The majority of the work is performed in a standard office setting.

Other Significant Facts:

The Sensitivity level of the position is Special-Sensitive. The incumbent of this position must be eligible for, and maintain, Sensitive Compartmented Information access.

4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TELENOR SATELLITE SERVICES, INC., Plaintiff, v. UNITED STATES, Defendant. | No. 05-528C<br>Baskir, J. |

AFFIDAVIT OF LAWRENCE PAUL

County of Montgomery )
) ss.
State of Maryland )

The affiant, Lawrence Paul, being duly sworn, states as follows:

1. I am the Director, Business Development, of Telenor Satellite Services, Inc. My offices are in the company headquarters in Rockville, Maryland, and I have held this position during the entire period related to this action. I have firsthand knowledge of what I state in this affidavit.

2. I was the principal Telenor business contact of the Department of State with respect to the USAID Disaster Assistance Response Team (DART) pilot program in Iraq. Telenor was requested to provide satellite communications equipment (four GAN terminals) to the Department of

State to allow access to high-speed data (internet) and voice satellite communications, at no charge, for humanitarian purposes to support the DART pilot program in Iraq for two months.

3. I met and spoke with Department of State representatives on several occasions with respect to the DART pilot program. In particular, I met with Mr. Reid A. Daugherity of the Department of State, Bureau for Intelligence and Research. Mr. Daugherity represented himself to be the leader of the DART pilot program for the State Department. Mr. Daugherity informed me that his upper-level supervisors, including Deputy Assistant Secretary for Analysis and Information Management, Mr. William Wood, supported the DART pilot program and Telenor's participation in it.

4. I told Mr. Daugherity that Telenor was willing to cooperate in the DART pilot program under the following conditions:

(a) the Telenor equipment would be used for the DART pilot program only;

(b) the equipment would be used only for two months and then returned to Telenor;

(c) that use after two months would need to be authorized by Telenor; and

(d) Telenor needed the terms of the agreement put in writing by the Department of State.

5. On March 13, 2003, Mr. Daugherity came to the Telenor offices for training on the Telenor satellite communications equipment. Mr. Daugherity delivered to me an agreement signed by himself dated March 12, 2003, on U.S. State Department letterhead, in which he set out the terms of agreement as I had previously requested. This letter is Attachment A to the Complaint.

6. On March 17, 2003, I attended a meeting at the Department of State in the office of Deputy Assistant Secretary Wood. Mr. Wood, Mr. Daugherity, and others were present at the meeting. (Mr. Daugherity had not yet left with the equipment for Iraq.) Mr. Wood at that meeting expressed his knowledge of Telenor's participation in the DART program and expressed his appreciation and approval of that participation. We discussed expressly that Mr. Daugherity would be taking Telenor's equipment to Iraq for the exclusive purpose of the DART program for two months and that Telenor had agreed to this participation upon the conditions stated in Mr. Daugherity's March 12 letter.

7. On or about March 21, 2003, we packed up the four GAN terminals and had them delivered to Mr. Daugherity, who took custody of them so he could take them to Iraq.

8. On May 11, 2004, Telenor's General Counsel, Barbara Spencer, and I met with Mr. Dennis J. Gallagher, an attorney with the State Department. Ms. Spencer and I explained the situation to him, including that we had previously invoiced Mr. Daugherity for the unauthorized use, which Telenor had done at its standard published service rates, and that we desired prompt payment. (Attachment B to the Complaint.). We stated that the amounts involved were too large for Telenor to ignore, but that we hoped to avoid suing the State Department with his assistance. Mr. Gallagher said he would investigate the matter and get back to Ms. Spencer with the State Department position, which he then did by his letter of June 9, 2004. (Attachment C to the Complaint.)

Further affiant saith not.

Lawrence Paul

Sworn to and subscribed
before me on this 1
day of December 2005.

Notary Public
April Reva de Bremond
My Commission Expires
April 1, 2008.

5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TELENOR SATELLITE SERVICES, INC., Plaintiff, v. UNITED STATES, Defendant. | ) | No. 05-528C Baskir, J. |

SECOND AFFIDAVIT OF LAWRENCE PAUL

County of Montgomery )
) ss.
State of Maryland )

The affiant, Lawrence Paul, being duly sworn, states as follows:

1. I am the same Lawrence Paul who previously executed an affidavit in support of Telenor's Motion for Partial Summary Judgment Re Authority on December 1, 2005. I have firsthand knowledge of what I state in this affidavit.

2. I have now had opportunity to read the Declaration of Reid A. Daugherity filed by the government in support of its Cross-motion for Summary Judgment. I have prepared this second affidavit in partial response to Mr. Daugherity's declaration.

3. I do not agree with certain of the particulars in Mr. Daugherity's declaration concerning the March 12, 2003, bailment contract and its negotiation and execution. I reaffirm what I stated in my first affidavit. In addition, representatives of other companies involved and I met not only with Mr. Daugherity and Secretary Wood, but also with other State Department representatives in meetings.

4. As I stated in my first affidavit, Mr. Daugherity prepared the final bailment contract on State Department letterhead, after receiving explicit information from me as to the conditions of Telenor's participation, and hand-delivered it to me on March 13, 2003, at Telenor's offices. The addressee, Ms. Britt Carina Horncastle, was and is the President of Telenor.

5. The March 12, 2003, letter states in the last paragraph, "Telenor must authorize any other use of the GAN terminals for purposes other than what has been stipulated in the two-month DART pilot program." Telenor did not authorize any other use than the DART pilot program.

6. The final sentence of the March 12, 2003, letter from Mr. Daugherity to Ms. Horncastle reads, "In the event that the terminals should be used for other purposes Telenor will provide service to the user at agreed upon service rates." By this sentence, I believed it was clearly

expressed that Telenor expected compensation should the government use Telenor's equipment other than as stipulated for two months for the DART pilot program or in violation of any other of the "provisos of operation" as stated in the March 12, 2003, letter.

7. Shortly after Telenor discovered that its equipment was being used for purposes other than as had been stipulated for the DART pilot program, Telenor shut off the satellite communications capability of those terminals. This occurred by June 11, 2003. Based on later analysis of the usage pattern, it appears likely that there was greater unauthorized use of the GAN terminals than that for which Telenor initially billed the State Department.

Further affiant saith not.

[signature]
Lawrence Paul

Sworn to and subscribed
before me on this 30
day of January 2006.

[signature]
Notary Public
April Reva de Bremond
my commission Expires
April 1, 2008

6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TELENOR SATELLITE SERVICES, INC., Plaintiff, v. UNITED STATES, Defendant. | ) | No. 05-528C (Baskir, J.) |

City of Washington )
) ss:
District of Columbia )

RULE 56(f) AFFIDAVIT OF
FREDERICK W. CLAYBROOK, JR.

The affiant, being duly sworn, states as follows:

1. I am counsel of record for Telenor in this action.

2. I present this affidavit pursuant to RCFC 56(f), which provides for counsel to submit an affidavit in opposition to a motion for summary judgment when the party counsel represents cannot present facts essential to justify the opposition without discovery.

3. This affidavit is submitted in opposition to the Defendant's Cross-motion for Summary Judgment, filed January 6, 2006. Nothing in

this affidavit should be construed to suggest that Telenor is not entitled to summary judgment pursuant to its motion of December 2, 2005.

4. Defendant in its motion asserts, by argument and affidavit of Corey M. Rindner, Procurement Executive of the Department of State, that Mr. Daugherity, who signed the bailment agreement with Telenor, did not have procurement contracting authority delegated to him. Assuming *arguendo* that part or all of the bailment contract was a procurement contract (which Telenor contests), Mr. Daugherity's agreement could have been ratified by others in the State Department who did have procurement authority.

5. To determine this "personal" (as opposed to "institutional") ratification question, Telenor would need discovery, as that information is not otherwise available to Telenor. For example, Telenor would need to discover (a) which individuals within the State Department knew of the arrangements with Telenor, (b) whether any or all of those individuals had procurement authority, and (c) the reaction and response of those individuals to the arrangement with Telenor.

6. Procurement Executive Rindner declared (at ¶ 2), "Contracting and grant authority for the Department of State is normally delegated in writing through a contracting officer's warrant or a grant officer's warrant."

(Emphasis added.) Telenor would also need discovery to understand what is meant by "normally" and to understand the other methods by which procurement authority can be delegated within the Department of State, and to whom.

7. In support of its Cross-motion for Summary Judgment, Defendant has put forward declarations with extrinsic evidence purporting to testify about the intent and interpretation of Mr. Daugherity's position description. While Telenor believes this proffered testimony is immaterial and inadmissible for the reasons stated in its contemporaneously filed motion to strike, if the Court disagrees and would give any weight or consideration to such extrinsic evidence, then Telenor would need discovery (a) to understand the statements made in the declarations, (b) to test those statements by cross-examination, (c) to question about other relevant portions of the position description of Mr. Daugherity and perhaps those of others, (d) to determine other relevant sources of information concerning the interpretation and intent of the position description(s), and (e) to determine what other non-procurement agreements and/or arrangements Mr. Daugherity, others in his or similar positions, and his supervisors may have entered into in the course of their duties.

8. While Telenor does not understand at present there to be a controversy concerning the material facts of whether the relevant Office of the State Department was authorized to carry out programs such as the DART Pilot Program, if such a controversy did develop Telenor would need to discover the "functional statement" of the relevant office(s). The Foreign Affairs Manual provides, "Functional statements provide the minimum detail to define the area of responsibility of an organizational unit . . . . To facilitate the classification of positions at all organization levels, functional statements are required for all approved organizational structures . . . . In general, functional statements approved by the Under Secretary for Management constitute official delegations for the Department. . . . Once the Under Secretary has delegated authority over a topic to a bureau, the bureau heads may redelegate that authority within their bureau if they are specifically granted redelegation authority." 1 FAM 014.7.a, .b. These functional statements are not published in the FAM and so are generally unavailable except through discovery.

9. While Telenor believes that the uncontested facts are sufficient to establish an implied-in-fact procurement contract as well as a bailment contract, there are many details concerning the unauthorized use by the United States of Telenor's equipment and satellite communication services

that at present are unknown to Telenor and can only be determined through discovery (a) to identify relevant individuals with knowledge and (b) to determine the specifics of the unauthorized use. Should the Court deem such information material for purposes of the summary judgment motions, Telenor would also need discovery in this area.

Further affiant saith not.

Frederick W. Claybrook, Jr.

Sworn to and subscribed before me
this 25th day of January 2006.

Notary Public

Johnetta D. Jackson
Notary Public, District of Columbia
My Commission Expires 11-30-2009

DCIWDMS: 2697458_1

7

Secretary has delegated this authority, through the Deputy Secretary, to the Under Secretary for Management (M). Within the policy guidelines established by the Under Secretary, operational responsibility for position management lies with the Department's line managers. Therefore, bureau heads (and managers of similar or higher rank with independent staffs) have primary accountability for assuring that the organizations under their direct control conform with the organizational objectives established by the Under Secretary for Management.

## 1 FAM 014.1 General Organizational Objectives

*(TL:ORG-62; 01-31-1995)*

a. Consistent with the overall U.S. Government policy of ensuring the most effective use of Government resources, any proposed new organizational structure should strive to achieve a proper balance among:

(1) Mission needs;

(2) Efficiency of operations; and

(3) Effective employee utilization.

b. The first step is to identify the basic mission and authorities delegated to the organization. Organizational planning should then be guided by the objective categories outlined below.

(1) Meeting Department priorities;

(2) Improving service delivery; and

(3) Improving internal management.

## 1 FAM 014.2 Organizational Nomenclature

*(TL:ORG-62; 01-31-1995)*

The basic nomenclature for the Department's organizational structure is summarized below. There are some exceptions to the basic nomenclature; these exceptions, for the most part, reflect specific legislative requirements:

| Organization Level | Title of Nomenclature | Organization Head |
|---|---|---|
| Level 1 | Department | Secretary |
| Level 1a | Department | Deputy Secretary |
| Level 1b | Department | Under Secretary |
| Level 1c | Department | Ambassador at Large |
| Level 2 | Bureau | Assistant Secretary |
| Level 3 | Non Specified | Deputy Asst. Sec. |

| | | |
|---|---|---|
| Level 3a | Directorate | Managing Director |
| Level 4 | Office | Director |
| Level 5 | Division | Chief |
| Level 6 | Branch | Chief |
| Level 7 | Section | Chief |

## 1 FAM 014.3 Generic Responsibilities

*(TL:ORG-62; 01-31-1995)*

a. The **Department** is headed by the Secretary who promulgates such rules and regulations as may be necessary to carry out the functions vested by statute or executive order in the Department. The Secretary may delegate authority to perform any of these functions including, if so specified, the authority to redelegate any of the functions to officers and employees under the Secretary's direction and supervision (22 U.S.C. 2651a):

(1) The **Deputy Secretary** serves as the Acting Secretary in the Secretary's absence. The Deputy Secretary also serves as principal adviser to the Secretary in the formulation and conduct of all U.S. foreign policy and assists the Secretary in providing overall supervision and direction to all substantive and administrative elements of the Department.

(2) **Under Secretaries** assist the Secretary and Deputy Secretary in the formulation and conduct of U.S. foreign policy and provide specific leadership in matters such as:

(a) Interdepartmental activities of the U.S. Government abroad;

(b) Intergovernmental affairs;

(c) Foreign economic and commercial policy;

(d) Security assistance programs;

(e) Global human rights, crime, science, and environment programs; and

(f) Administrative operations of the Department.

(3) **Ambassadors at Large** are appointed by the President and serve anywhere in the world to help with emergent problems, to conduct special or intensive negotiations, or serve in other capacities, as requested by the Secretary or the President.

b. **Bureaus** and some other specified Department organizations, usually headed by assistant secretaries or positions administratively equivalent to

the rank of assistant secretary, administer one or more major functions of the Department. If the bureau has more than one major function and is an organization of substantial size and or complexity, it should be further structured to have deputy assistant secretaries (DAS), or positions ranked equivalent thereto, to oversee these major functions. Where the size and scope of a major function requires it, a managing director may oversee collections of office-level sub-functions. A managing director is never equivalent to deputy assistant secretary rank. Managing directors only report directly to deputy assistant secretaries, and directorate structure is such that managing directors are to have clearly defined managerial responsibilities (they are not deputies to deputy assistant secretaries).

c. **Offices** are structures below the DASs and are constructed around sub-functions which require application of discrete bodies of knowledge and the exercise of policy control within that field. These structures usually are responsible for a complete functional field and are staffed with professionals or specialists who are considered to be authorities in this field.

d. Within the office structure there may be **divisions** which are tasked with performing contiguous processes or perform staff or operating activities or carry out major sub-elements of the general functional field.

e. **Branches** and **sections** are further sub-divisions of the responsibilities assigned to a Division.

f. **Staff** (as an organizational unit) is a structure consisting of a minimum of 6 persons assigned to another organizational unit at any level. Staff functions are generally discrete and self-contained. A staff may or may not have its own chief.

## 1 FAM 014.4 Organization Planning Principles

*(TL:ORG-62; 01-31-1995)*

a. Organizational layers should be limited to the minimum number consistent with effective span of control and performance of mission. The addition of non-essential supervisory layers increases problems associated with establishing clear delegation of responsibility and authority, transmission of information, work flow, clearances, operational costs, and morale.

b. Full deputy or assistant positions are normally appropriate only at higher levels within the organization. Proliferation of deputy positions is a major source of poor organizational design and position management.

c. Staff units which report directly to an assistant secretary should be established only to provide direct support in the development of policy or

bureau; and

(c) A listing of any new or changed delegations of authority. Refer to subchapter 2 FAM 1140 regarding this issue.

e. Approved organization charts will become the Department's official organization charts after the functional statements have been published in the FAM.

f. Changes in organization below the office director level should meet these criteria but may be approved by the assistant secretary or equivalent head of the bureau:

(1) To ensure organizational consistency at all levels of the Department, subordinate managers shall submit to the bureau and/or equivalent head a request containing the information described in paragraph c above. A copy shall be retained by the bureau executive director's office so long as the organizational structure remains valid.

(2) When approving organization changes below the office director level (including the granting of appropriate exceptions to these criteria), the bureau/equivalent head shall review the proposed changes in light of the organization principles and control provisions cited herein. Prior to approval, the approving official is encouraged to consult with HR/CSP, HR/RMA, and M/P on organizational structure, position classification, position, and general policy implications of proposed structures.

(3) After approval, **AND PRIOR TO THE IMPLEMENTATION DATE**, such changes must be reported to HR/CSP, HR/RMA, M/P, and A/RPS/DIR so that necessary implementation steps can be taken.

## 1 FAM 014.6 Organizational Policies and Criteria

*(TL:ORG-82; 12-01-1999)*

a. Organizational layering is to be kept to a minimum. If an organization establishes sub-component structures, it should divide into at least two lower level structures, (e.g., no bureau may have just one office level sub-component; no office may have just one division level sub-component, etc.). Bureaus and equivalent levels are divided first into office level and then into division level nomenclature. Routine functions (such as certain administrative activities) may be further subdivided to branch and section levels.

b. Regional bureaus may be organized on sub-regional, multiple country, and/or individual country bases. This structure is designed to be flexible

and contemplates the regrouping of countries whenever workload, crises, or other operational matters indicate this to be desirable. These organizational components are equivalent to an office.

c. Organizational structures involving full deputy or assistant positions are to be minimized and reserved for situations where the volume and nature of the principal's work cannot be effectively accomplished by one person.

(1) The deputy/assistant participates with the principal in carrying out the full range of management responsibilities and acts with full authority over the total work of the organization during the principal's unavailability or absence. Where the supervision of an office needs to be sub-divided, the appropriate sub-components are divisions led by division chiefs. Specialized deputies (usually multiple in number) to oversee specific aspects of the organization (e.g., Deputy for Policy or Deputy for Operations) constitute exceptions to this policy and are rarely justified.

(2) There are no provisions for deputy positions to under secretaries, deputy assistant secretaries, managing directors, division chiefs, branch chiefs, section chiefs, or staff chiefs.

(3) The classification approval required for the establishment of full deputy/assistant positions is vested in the director, HR/CSP; all requests to classify full deputy/assistant positions will be reviewed against criteria issued by HR/RMA.

d. To maintain effective and efficient span of control, the following criteria will guide the design of the organizational structure:

(1) Except for staff units, **ANY** organizational entity or sub-component requires a minimum of 8 employees (vacant positions should not be used to justify the establishment of organizational entities) in the absence of overriding functional considerations.

(2) Subdividing an organization should result in the smallest possible number of sub-components consistent with the above criteria and with the requirements of the organization's functional mission.

(3) An office should have at least 12 employees. The total number of employees may consist of full-time permanent, part-time permanent, or similar temporary positions (including private sector contractor positions if appropriate—see item d(4) below). To minimize the potential for organizational fluctuations, the majority of the positions cited as justification for the establishment/existence of an office should be permanent. If the organization drops below the appropriate number of positions for a period exceeding 6 months, consideration should be given to its abolishment and/or

consolidation into some other existing unit.

(4) Private sector contractor positions may be used as the basis for the establishment/existence of an office or other organizational entity only:

(a) After the minimum number of employees (i.e., 8) are present to constitute an organization;

(b) The positions represent a continuing work requirement and/or work force; and

(c) Supervision of the position(s) involves more than oversight responsibilities (i.e., the supervisor assigns, review, and evaluates work products; establishes priorities and deadlines for work; and accepts or rejects work products) for a continuing recognizable work force on a regular and recurring basis.

e. Because the Department's fundamental organizational building block is the office, the following guidelines should be considered carefully in creating an office:

(1) Like functions should be grouped together in an organization;

(2) Integral policy or operational fields should not be divided into separate offices; and

(3) The level and degree of policy and negotiating responsibility exercised by the organization are important factors in determining the need for an office.

## 1 FAM 014.7 Functional Statements

*(TL:ORG-104; 06-30-2001)*

a. Functional statements provide the minimum detail to define the area of responsibility of an organizational unit, to distinguish its activities from those of related units, and to eliminate potential overlap and duplication. To facilitate the classification of positions at all organization levels, functional statements are required for all approved organizational structures, even though such statements may not be published in the FAM.

b. In general, functional statements approved by the Under Secretary for Management constitute official delegations of authority for the Department. Authority vested in an individual position becomes a part of the authority of each position in the direct line of supervision above that

position, except where authority is specifically vested by law in a designated official. Once the Under Secretary has delegated authority over a topic to a bureau, the bureau heads may redelegate that authority within their bureau if they are specifically granted redelegation authority.

c. Bureaus or offices are responsible for submitting updated functional statements to the Directives Management Staff (A/RPS/DIR), whenever necessary, to ensure that 1 FAM, *Organization and Functions*, is current at all times. Bureaus or offices are also responsible for providing copies of updated functional statements and organization charts to HR/CSP and HR/RMA to facilitate their classification and position management responsibilities.

## 1 FAM 015 ORGANIZATION SYMBOLS

*(TL:ORG-124; 06-13-2003)*

a. Organization symbols are assigned by the Office of Financial Policy and Management Controls (RM/GFS/FPRA/FPMC). New Department units are to have FPMC assign and/or approve their symbols before obtaining organization codes.

b. Organizational changes (i.e., office symbols) must be codified in 1 FAM. Although ALDACS and Department Notices can be used to transmit organizational changes, these are interim means of communications. Both ALDACS and Department Notices expire 90 days from date of issuance (see 2 FAM 1115.2 paragraph a.).

## 1 FAM 016 THROUGH 019 UNASSIGNED

Tel. Appx. 29

# 1 FAM 011 Exhibit 011
# UNITED STATES DEPARTMENT OF STATE

*(TL:ORG-141; 07-08-2005)*



# 1 FAM 430
# BUREAU OF INTELLIGENCE AND RESEARCH (INR)

*(TL:ORG-81; 10-01-1999)*

## 1 FAM 431 ASSISTANT SECRETARY FOR INTELLIGENCE AND RESEARCH (INR)

### 1 FAM 431.1 Responsibilities

*(TL:ORG-62; 1-31-95)*

a. Provides intelligence support for the Secretary of State, other Department principals and policy bureaus and directs the Department's program of research and analysis.

b. Serves as the representative of the Secretary of State in the Intelligence Community, conducts liaison with the Director of Central Intelligence and the Intelligence Community for the Department, and participates in all community intelligence analysis.

c. Assists in coordinating all U.S. intelligence activities with U.S. foreign policy, and that all policies and directives relating to intelligence activities (including dissemination of intelligence relating to foreign policy) are carried out in accordance with the law and Executive Order 12333 dated December 4, 1981.

d. Issues all taskings from the Department to intelligence agencies for intelligence.

e. Maintains information management systems to ensure efficient, timely receipt, processing and dissemination of intelligence materials to perform its role as a member of the Intelligence Community and to support the Department.

f. Provides for secure handling of sensitive intelligence materials within the Department. Approves or disapproves proposals by Department offices for declassification or exceptional use of any information derived from intelligence sources.

g. Has substantive responsibility for the following Department regula-tory publications:

(1) Foreign Affairs Manual Volume 1 (Organization and Functions) subchapter 1 FAM 430 —Bureau of Intelligence and Research (INR);

(2) Foreign Affairs Manual Volume 2 (General) subchapter 2 FAM 110 (partial) and its related Foreign Affairs Handbook in its entirety (Classified Intelligence Handbook, to be published in 1995).

## 1 FAM 431.2 Organization

*(TL:ORG-62; 1-31-95)*

An organization chart of INR is found as 1 FAM 431 Exhibit 431.2 .

## 1 FAM 431.3 Authorities

*(TL:ORG-62; 1-31-95)*

a. Executive Order 12333 dated December 4, 1981.

b. 22 U.S.C. Sections 2651a and 2656.

c. 50 U.S.C. Sections 413-414.

d. National Security Act of 1947, as amended.

e. Intelligence Organizations Act of 1992 (Pub. L. 102-496).

f. Other authorities, as appropriate.

*g. Presidential Directive, dated January 25, 1963*

*h. Executive Order 12048 dated March 27, 1978*

*i.* Other authorities, as appropriate.

### 1 FAM 432.4 Office Of Research (INR/PDAS/R)

*(TL:ORG-81; 10-01-1999)*

*a. Commissions and manages studies of foreign public and elite opinion around the world on major policy issues.*

*b. Produces written analyses of foreign opinion for high-level policy makers and briefs results to officials.*

*c. Produces daily analyses of foeign media editorial commentary on major policy issues for officials in Washington, D.C. and abroad.*

## 1 FAM 433 DEPUTY ASSISTANT SECRETARY FOR ANALYSIS (INR/AN)

*(TL:ORG-62; 1-31-95)*

a. Manages a comprehensive program of current and long-term intelligence analysis for the Department, based on information from all sources for the Secretary and the Department's principal policy officers.

b. Directly supervises 9 offices and one staff, as directed by the Assistant Secretary.

### 1 FAM 433.1 Geographic Office Directors

*(TL:ORG-62; 1-31-95)*

a. Geographic Office Directors manage offices which produce analysis of issues relating to their countries of assignment.

b. The Geographic offices are:

(1) Office of Analysis for Africa (INR/AN/AA), responsible for sub-Saharan Africa.

(2) Office of Analysis for East Asia and the Pacific (IN/RAN/EAP), responsible for East Asia and the Pacific.

(3) Office of Analysis for Europe and Canada (INR/RAN/EUC), responsible for Canada and all European countries, excluding the Baltics, Russia, and Ukraine.

(4) Office of Analysis for Inter-American Affairs (INR/RAN/IAA), responsible for Latin America and the Caribbean.

(5) Office of Analysis for Near East and South Asia (INR/RAN/NESA), responsible for the Near East, including North Africa, and South Asia.

(6) Office of Analysis for Russia and Eurasia (INR/RAN/REA), responsible for Russia and all other states which were formerly a part of the Soviet Union.

## 1 FAM 433.2 Office of Economic Analysis (INR/AN/EC)

*(TL:ORG-62; 1-31-95)*

Produces analysis of international economic issues.

## 1 FAM 433.3 Office of The Geographer and Global Issues (INR/AN/GGI)

*(TL:ORG-62; 1-31-95)*

a. Produces analysis of issues relating to international boundaries, territorial disputes, maritime jurisdictions and resources, environmental and energy issues, refugee and migration affairs, humanitarian crises and UN affairs, and international organizations.

b. In consultation with country directors, determines official geographic nomenclature used by U.S. Government agencies.

c. Advises the Department and other Federal agencies on geographic and cartographic matters. Produces maps for the Department, reviews maps and charts produced by other agencies, and participates in intragency geographic-related functions and issues.

d. The Office Director serves as The Geographer of the United States.

## 1 FAM 433.4 Office of Publications (INR/AN/PUB)

*(TL:ORG-62; 1-31-95)*

Standardizes format, assures quality in INR publications, and edits and produces all Bureau publications, including the Secretary's Morning Intelligence Summary.

## 1 FAM 433.5 External Research Staff (INR/AN/RES)

*(TL:ORG-62; 1-31-95)*

# 1 FAM 431 Exhibit 431.2
# BUREAU OF INTELLIGENCE AND RESEARCH (INR)

*(TL:ORG-81; 10-01-1999)*



published in the *Federal Register*. For example, authorization to incur an obligation on behalf of the U.S. Government or the certification of vouchers for payment; authority to determine that an exigency of the public business was of such major importance that an employee could not use annual leave and to approve restoration of the forfeited annual leave; or delegation of responsibility for program management; etc.

*d.* When approved and signed by the authorizing officer, forward the delegation, *and an electronic version if it is to be published in the Federal Register,* to the Directives *Management Staff (A/RPS/DIR)* for numbering and recording. Note that an officer may not sign on behalf of another; the signature must match the typed name and, if appropriate, indicate an acting capacity.

# 2 FAM 1144 MEDIA OF DELEGATIONS

*(TL:GEN-295; 09-14-1999)*
*(State Only)*

a. All delegations of authority are promulgated through officially established media *as applicable, including the Federal Register. DIR maintains current and rescinded delegations of authority (the latter for historical purposes). Where possible, A/RPS/DIR will make delegations and their amendments available electronically.*

b. *Where possible*, prepare statements of delegated authority for inclusion in 1 FAM, Organization and Functions, or other volumes of the Foreign Affairs Manual. *This* volume serves as the general medium for conferring authority to organizational units and their heads to perform the duties and responsibilities allocated to them. An assistant secretary is authorized to act in lieu of the Secretary on matters within the terms of reference of that particular assistant secretary. In the absence of the assistant secretary from duty, his or her functions are performed by the deputy assistant secretary of the particular bureau or area who uses the title "Acting Assistant Secretary for..." and exercises all the authority conferred upon the assistant secretary.

# 2 FAM 1145 CONTENTS OF DELEGATIONS

*(TL:GEN-295; 09-14-1999)*
*(State Only)*

a. Delegations of authority should be made directly to the designated officer by title. In most cases this would be a special assistant to the Secretary,

***Maintenance review:*** *A periodic review of all position descriptions in an organization to ensure that position descriptions remain accurate, that all previous classification determinations remain valid, and that all positions on record for an organization are required to accomplish the mission of the organization.*

***Major duties and responsibilities:*** *Those duties and responsibilities assigned to a position that:*

- *Are performed on a regular and recurring basis;*
- *Require a substantial portion of the employee's time; and*
- *Determine the qualifications requirements for complete and successful performance of the duties of the position.*

***NOTE****: All major duties and responsibilities must be described in the position description in sufficient detail to permit assignment of the proper pay plan, title, occupational series, and grade level to the position.*

**Position classification:** (See Classification).

**Position description (PD):** An official written *documentation* of management's assignment of *specific* duties, responsibilities, and supervisory relationships to a position*, as well as required knowledge and skills necessary to perform the assigned duties. The Position description (PD) library is a collection of previously classified position descriptions that is available in electronic form via the Department of State Intranet.*

***Position management:*** *The process of managing the way in which work-year allocations are utilized by an organization. This includes planning and implementing organizational structures comprised of the number, kinds and levels of positions required in an organization to accomplish mission objectives within the framework of authorized resource allocations.*

***Rank-in-person:*** *A practice, by which a FS employee is graded as an individual and not because of the duties of the position that she/he occupies, based on individual qualifications, seniority, and performance. Personal rank remains the same regardless of the class of the position to which a FS employee is assigned.*

***Reconsideration request:*** *A written request to the Director, HR/CSP, by a supervisor or manager to review an initial classification determination by a CSP/C or Bureau classifier for a position under their jurisdiction (see 3 FAM 2639). Employees are not permitted to initiate reconsideration requests, but may assist managers and supervisors in formulating such requests.*

c. *Ensure that appropriate consultation is sought with HR/CSP and/or HR/RMA, prior to requesting final action from HR/CSP and/or HR/RMA or taking final action under delegated authority, on unusual or precedent-setting position classification and/or position management actions.*

## 3 FAM 2637.6 Bureau Human Resource Supervisors and Specialists

*(CT:PER-552; 06-22-2005)*
*(State Only)*
*(Applies to Foreign Service and Civil Service Employees)*

a. *Conduct all position classification and position management activities in accordance with Federal law and regulation, applicable provisions of the FAM and FAH, CSP and Resource Management and Analysis (RMA) guidelines, and the terms of the Bureau's Memorandum of Understanding with HR/CSP regarding delegated position classification authority (for those Bureaus delegated such authority).*

b. *Consult with HR/CSP and/or HR/RMA regarding unusual or precedent-setting position classification activities before requesting final action from CSP and/or RMA or taking final action under delegated position classification authority.*

c. *Conducts or assists in the conduct of periodic maintenance reviews of Civil Service and domestic Foreign Service positions, in accordance with established schedules and the provisions of 3 FAM 2638.2.*

## 3 FAM 2637.7 Managers and Supervisors

*(CT:PER-552; 06-22-2005)*
*(State Only)*
*(Applies to Foreign Service and Civil Service Employees)*

a. *The certification of position descriptions, which ensures the accuracy of the position description and its necessity for the performance of government work under the control of the supervisor, is the responsibility of each individual manager and/or supervisor. Each manager and supervisor has a personal and legal responsibility, when signing Form, OF-8 for Position Description (civil service), to ensure that the job is properly described and required. Misrepresentation of actual duties and responsibilities of a position constitutes mismanagement and misuse of the resources of the government.*

b. *Managers and supervisors should participate fully in the classification*

## Special Studies/Surveys

*(CT:PER-552; 06-22-2005)*
*(State Only)*
*(Applies to Foreign Service and Civil Service Employees)*

a. *Each Bureau's position descriptions (PDs) shall be required to undergo a formal maintenance review on a periodic basis to ensure their adequacy and to verify the proper evaluation and classification of all positions within the Bureau. Periodic review dates will be assigned by HR/CSP in such a way that the reviews can be accomplished with minimal adverse impact on normal Bureau operations.*

b. *The performance of periodic maintenance reviews increases communication and cooperation between management officials and classifiers, and reduces the likelihood of inconsistencies between position descriptions, critical elements and performance standards, and actual duties performed by employees.*

c. *During these reviews, each supervisor will be responsible for the following tasks with regard to all positions that under his/her first-level direction:*

   (1) *Review each position description and determine whether any changes in duties, responsibilities, authority levels or supervisory relationships have occurred since the position description was either classified or last reviewed for classification accuracy. The supervisor may engage subordinate employees in this process; however, the ultimate responsibility for assigning and accurately and completely describing the work resides with the supervisor;*

   (2) *Certify whether each position assigned to the supervisor's organization is accurate (a summary reporting sheet will be provided for this purpose);*

   (3) *Prepare and certify revised position descriptions for those positions found to be inaccurate; and*

   (4) *Submit the completed summary sheet and any revised position descriptions, with certified coversheets, to HR/CSP or their delegated Bureau classification staff, through their Bureau Executive Office, for evaluation and classification of revised PDs.*

d. *Vacancy reviews should be conducted whenever a position becomes vacant, in order to determine if the position is still necessary and if it is correctly classified. Positions found to have significantly changed will be audited by a HR/CSP/C or Bureau classifier. Results will be reviewed by HR/CSP, which will provide a report that covers the findings and*

# 3 FAH-2 H-440 POSITION DESCRIPTIONS

## 3 FAH-2 H-441 GENERAL CONSIDERATIONS

### 3 FAH-2 H-441.1 Definition and Format

*(TL:FSNH-3; 8-2-93)*

A position description is an official statement of the duties, responsibilities, and qualification requirements of a position. All position descriptions will be prepared on form OF-298, "Interagency Foreign Service National Position Description." This form provides for recording certain identifying data and certifications, and information about qualifications and position in a specified order. Certain instructions and guidance which will be helpful in describing the duties and responsibilities of the position are provided in 3 FAH-2 H-400 Appendix B , "Instructions for Preparing Interagency Foreign Service National Position Description."

### 3 FAH-2 H-441.2 Why Position Descriptions Are Needed

Position descriptions are needed to provide a basis for accurate classification, but they serve a number of other purposes, including: assisting management officials in the budgeting process and in making organizational studies, providing the supervisor with a tool for training new employees and for gaining a common understanding of the work of an organizational unit, and aiding the personnel officer in recruiting new employees and planning career development programs.

### 3 FAH-2 H-441.3 When Position Descriptions Are Needed

A position description is needed whenever a new position is established. A new or revised description is needed whenever there is a material change in the duties, responsibilities, or organizational relationships of an existing position. Although all material changes should be promptly reported by new or amended descriptions, it is a good practice to allow the change to establish before attempting to describe it. On the other hand, the supervisor should not allow a change to go unreported for very long.

### 3 FAH-2 H-441.4 Who Prepares Position Descriptions

#### A. Management's Responsibility

The first step in the process of preparing a position description is creating a position. A decision should be made that there is a valid management need

for a position consisting of certain agreed upon duties and responsibilities, and that authorized funds and position ceilings are available. It is a responsibility of management to make this decision and to take the necessary action to create the position. Management may also add, remove, or change duties, responsibilities, and assignments at any time. Thus, management is responsible for the currency, adequacy, and accuracy of position descriptions.

## B. The Supervisor's Responsibility

The American supervisor is usually responsible for initiating classification action, and he is always responsible for assuring that the positions under his direction are accurately described. In many cases, the American supervisor will direct the local employee performing the work, or that employee's local supervisor to prepare a position description. In some cases, it will be appropriate for the American supervisor to prepare the description personally. This may be appropriate when the position is vacant, when it is filled by a recently assigned employee who is not yet fully acquainted with it, when the position is undergoing change, or when the employee in the position does not have sufficient proficiency in English to prepare an adequate description. When the employee assigned to the position is directed to prepare the position description, the American supervisor is responsible for discussing the position with the employee, indicating the approach to be taken in describing it, reviewing the description the employee prepares to insure that the management concept of the position has been carried out, and finally, certifying that the description is a current and accurate representation of the duties and responsibilities of the position, and that there is a valid management need for the position.

## C. The Employee's Role

In many cases, the employee who incumbers the position will prepare the description. Even where he or she does not prepare the description, the employee is an important source of information about the position, and should be consulted by the person preparing the description.

## D. The Personnel Officer's Responsibility

The Personnel Officer or other American official charged with carrying out the personnel function has several responsibilities in the preparation of position descriptions, including:

### (1) Requesting New or Revised Position Descriptions

New or revised position descriptions should be requested when changes have occurred in organization, level of staffing, performance of functions, etc., which make existing position descriptions obviously inaccurate.

**(2) Instructing and Counselling Supervisors and Employees**

Supervisors and employees should be instructed, advised, and counseled concerning the preparation of position descriptions where such assistance is appropriate. The assistance may take a number of forms, including group lectures, demonstrations and audience participation sessions, individual discussions, and the preparation and distribution of written instructions, guides, check lists, and other aids.

**(3) Written Descriptions**

The Personnel Office should not make a general practice of writing descriptions, since it is not usually staffed to perform this function. In certain circumstances, however, it may be appropriate. For example, it may be well for the Personnel Office to prepare position descriptions where two employees disagree as to exactly which parts of a function each performs. It may also be appropriate for the Personnel Office to prepare position descriptions when new descriptions have been requested, but the organization concerned has not prepared them after a reasonable period to time. When a mission or office is to be established or a new program instituted, the Personnel Office may prepare the initial FSN position descriptions.

**(4) Reviewing Descriptions**

The Personnel Office must review position descriptions received from organizations serviced to insure the descriptions are understandable, in proper form, reasonably brief, prepared in accordance with instructions, contain the information needed for classification purposes, and are not in conflict with other position descriptions or with known facts about organizations and functions. When descriptions are unsatisfactory for any of the above reasons, they should be returned to the originating organization for rewriting. The Personnel Officer must be personally satisfied that position descriptions are accurate. When the Personnel Officer is unable to obtain an accurate description from the employing unit, the position should be audited and appropriate audit notes prepared, attached to the position description, and used in the classification of the position.

# 3 FAH-2 H-442 PREPARING POSITION DESCRIPTIONS

Position descriptions will be prepared in accordance with the instructions contained in Appendix B, "Instructions for Preparing Interagency Foreign Service National Position Description."