IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TELENOR SATELLITE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-528C |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

CONSOLIDATED STATEMENT OF
UNCONTROVERTED FACTS IN SUPPORT
OF CROSS-MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims and ¶ 12 of the Court's June 2, 2005 Special Procedures Order, plaintiff, Telenor Satellite Services, Inc., and defendant, the United States, state as follows:

1. [Telenor] **For their mutual benefit, Telenor delivered to the Department of State satellite communications equipment to allow high-speed data and voice satellite communications, at no charge, for humanitarian purposes to support the USAID Disaster Assistance Response Team (DART) pilot program in Iraq for two months.** (Complaint ¶ 1; Answer ¶ 1; Paul Aff. ¶¶ 2-7, Telenor Appx. at 10-13.)

2. [Defendant] **Mr. Reid A. Daugherity was, during all relevant times, a Foreign Affairs Research Analyst in the Office of the Geographer and Global Issues, Bureau of Intelligence and Research ("INR"), United States Department of State.** Appendix To Defendant's Cross-Motion For Summary Judgment And Response To Plaintiff's Motion For Summary Judgment ("Def. App.") 3 ¶ 1.

3. [Telenor] **Mr. Daugherity's immediate supervisor, during all relevant times, was Mr. Lee Schwartz, the Acting Director of the Office of the Geographer and Global Issues. Director Schwartz's immediate supervisor during all relevant times was (now-deceased) INR Deputy Assistant Secretary of State for Analysis and Information Management William Wood.** Def. App. 3 ¶¶ 6,7.

4. [Telenor] **In January 2003, Secretary Wood informed Mr. Daugherity that an arrangement for a pilot project had been reached with Michael Gray of a consortium called Global Relief Technologies. Deputy Assistant Secretary Wood explained to Mr. Daugherity that the pilot project's objective was to use satellite transmission to get humanitarian data (in the form of multiple completed humanitarian data forms) from Iraq to Washington, D.C., for real-time compilation and analysis and that Mr. Gray's consortium included Telenor, which would provide the satellite access via portable terminals for the pilot project.** Def. App. 4-5 ¶¶ 7, 8.

5. [Telenor] **Director Schwartz directed Mr. Daugherity to meet with Telenor concerning the use of Telenor's equipment for the DART pilot project.** Def. App. 5 ¶ 9.

6. [Telenor] **During all relevant times, Mr. Lawrence Paul was Director, Business Development, of Telenor; Ms. Britt Carina Horncastle was President of Telenor; and Ms. Barbara Spencer was General Counsel of Telenor.** (Paul Aff. ¶ 1, 8, Telenor Appx. at 10, 13; Second Paul Aff. ¶ 4, Telenor Appx. at 15.)

7. [Telenor] **During a meeting in early March 2003, Mr. Paul informed Mr. Daugherity that Telenor was willing to cooperate in the DART pilot program under the following conditions:**

**(a) the Telenor equipment would be used for the DART pilot program only;**

**(b) the equipment would be used only for two months and then returned to Telenor;**

**(c) that use after two months would need to be authorized by Telenor; and**

**(d) Telenor needed the terms of the agreement put in writing by the Department of State.** (Paul Aff. ¶ 4, Tel. Appx. at 11-12.)

8. [Telenor] **On March 13, 2003, Mr. Daugherity came to the Telenor offices for training on the Telenor satellite communications equipment.** (Paul Aff. ¶ 5, Tel. Appx. at 12.)

9. [Telenor] **Mr. Daugherity delivered to Mr. Paul on March 13, 2003, an ~~agreement~~ addressed to Ms. Horncastle and signed by himself dated March 12, 2003, on U.S. State Department letterhead, in which Mr. Daugherity ~~set out the terms of the bailment agreement~~.** (Complaint ¶ 5; Answer ¶ 5; Tel. Appx. at 1; Paul Aff. ¶ 5, Tel. Appx. at 12; Daugherity Decl. ¶ 10 & Exhibit, U.S. Appx. at 5-6, 8.)

Defendant objects to the characterization of the March 13, 2003 letter as a bailment agreement because the letter does not employ that term and does not contain any expression of assent by Ms. Horncastle (Def. App. 8), and because that assertion is a legal conclusion. In addition, defendant objects to the assertions to the extent that it implies that Mr. Daugherity drafted the letter. In fact, Telenor provided the text of the letter, which Mr. Daugherity placed on State Department letterhead. Def. App. 5-6 ¶ 10.

10. [Telenor] **The letter from Mr. Daugherity to Ms. Horncastle stated it was "to confirm receipt and provisos of operation regarding all equipment provided by Telenor" for the DART pilot program. The letter further provided that the specified Telenor equipment (four GAN terminals) would be used "for a two-month pilot program" commencing mid-March 2003 "to demonstrate and verify the feasibility of utilizing mobile satellite communication technology to improve coordination of global disaster recovery and reconstruction efforts of governments and non-governmental organizations." The March 12 letter also stated as follows: "Telenor must authorize any other use of the GAN terminals for purposes other than what has been stipulated in the two-month DART pilot program. In the event that the terminals should be used for other purposes, Telenor will provide service to the user at agreed upon service rates."** (3/12/03 letter, Tel. Appx. at 1, Def. App. 8.)

11. [Telenor] **On March 17, 2003, Mr. Paul attended a meeting at the Department of State in the office of Deputy Assistant Secretary Wood. Mr. Wood, Mr. Daugherity, and private officials were present at the meeting. (Mr. Daugherity had not yet left with the Telenor**

**equipment for Iraq.) Mr. Wood at that meeting expressed his knowledge of Telenor's participation in the DART pilot program and expressed his appreciation and approval of that participation. It was discussed expressly that Mr. Daugherity would be taking Telenor's equipment to Iraq for the exclusive purpose of the DART pilot program for two months and that Telenor had agreed to this participation upon the conditions stated in Mr. Daugherity's March 12 letter to Ms. Horncastle.** (Paul Aff. ¶ 6, Tel. Appx. at 12.)

12. [Telenor] **On or about March 21, 2003, Telenor packed up the four GAN terminals and had them delivered to Mr. Daugherity.** (Paul Aff. ¶ 7, Tel. Appx. at 13.)

13. [Telenor] **The Department of State took possession of the Telenor equipment for use in Iraq.** (Complaint ¶ 8; Answer ¶ 8; Paul Aff. ¶ 7, Tel. Appx. at 4; 6/9/04 letter, Telenor Appx. at 2-3.)

14. [Telenor] ~~**In April and May 2003, the State Department, in conjunction with the Army's 354th Civil Affairs Brigade, utilized the equipment to transmit "short-burst" communications in furtherance of the DART pilot program.**~~ (Complaint ¶ 8; Answer ¶ 8; 6/9/04 letter, Telenor Appx. at 2-3.)

Defendant objects because Telenor cites material other than pages of the appendix in support of its assertion, and because the appendix pages to which Telenor cites do not establish the assertion. The letter to which Telenor cites does not refer to use of equipment in April and May 2003. Tel. Appx 3.

15. [Telenor] **Upon conclusion of the use of Telenor's equipment in May 2003 for the DART pilot program, the State Department left two Telenor terminals in the possession of the Army.** (Complaint ¶ 9; Answer ¶ 9; 6/9/04 letter, Telenor Appx. at 2-3; Second Paul Aff. ¶ 7, Telenor Appx. at 16.)

16. [Telenor] ~~**For some period during May through June 10, 2003, representatives of the Army used Telenor's equipment for voice and data transmissions other than in support of the DART pilot program**~~. (Complaint ¶ 10 & Attach. E; Answer ¶ 10; 6/9/04 letter, Telenor Appx. at 2-3; Paul Aff. ¶ 8, Tel. Appx. at 13; Second Paul Aff. ¶ 7, Tel. Appx. at 16.)

Defendant objects because Telenor cites material other than pages of the appendix in support of its assertion, and because neither the affidavits of Mr. Paul nor the letter of Dennis J. Gallagher establish how the equipment was used during the period May through June 2003. Neither ¶ 8 of Mr. Paul's December 1, 2005 affidavit (Tel. Appx. 13 ¶ 8) nor ¶ 7 of his January 30, 2006 affidavit (Tel. Appx. 16 ¶ 7) establishes that Mr. Paul has first-hand knowledge of who used the equipment during that period or how the equipment was used during that period. The letter to which Telenor cites (Tel. Appx. 2-3) does not refer to the period May through June 2003, and does not explain who used the equipment or for what purpose during that period.

17. [Telenor] ~~**The Army's use of Telenor's equipment for voice and data transmissions other than in support of the DART program was done without Telenor's knowledge or consent.**~~ **Telenor did not provide its equipment to be used for other purposes for free.** (3/12/03 letter, U.S. Appx. at 8; Second Paul Aff. ¶ 5, Tel. Appx. at 15.)

Defendant objects because Telenor cites material other than pages of the appendix in support of its assertion, and because the only appendix pages to which Telenor cites (Def. App. 8; Tel. Appx. 15) do not establish that the Army used Telenor's equipment for voice and data transmissions other than in support of the DART program without Telenor's knowledge or consent.

18. [Telenor] **When Telenor discovered this use ~~unauthorized by the March 12, 2003, letter~~, it shut off the transmission capability of the equipment by June 11, 2003.** (Complaint ¶ 10; Answer ¶ 10; Second Paul Aff. ¶ 7, Tel. Appx. at 16.)

Defendant contests that the use was unauthorized by the March 12, 2003, letter because the letter does not contain any expression of assent by Telenor and provides that Telenor will provide service for use other than for purposes of the DART program, at "agreed upon service rates." Def. App. 8.

19. **[Telenor] The final sentence of the March 12, 2003, letter from Mr. Daugherity to Ms. Horncastle reads, "In the event that the terminals should be used for other purposes Telenor will provide service to the user at agreed upon rates." ~~By this sentence, it was expressed that Telenor expected compensation should the government use Telenor's equipment other than as stipulated for two months for the DART pilot program or in violation of any other of the "provisos of operation" as stated in the March 12, 2003, letter~~.** (Second Paul Aff. ¶ 6, Telenor Appx. at 15-16).

Defendant objects to the assertion that the March 12, 2003 letter expresses the expectations of Telenor because the letter is not signed by any Telenor representative. Tel. Appx. 1.

20. [Telenor] **In June 2003, Telenor invoiced the State Department, at Telenor's standard published service rates, for satellite telecommunications services provided for other than the DART pilot program. The State Department did not pay the invoice.** (Complaint ¶ 11 & Attach. B; Answer ¶ 11; Paul Aff. ¶ 8, Tel. Appx. at 13.)

21. [Telenor] **On May 11, 2004, Ms. Spencer and Mr. Paul met with State Department counsel, Mr. Dennis J. Gallagher. The Telenor representatives said that the amounts involved for the ~~unauthorized~~ use were too large for Telenor to ignore and that Telenor hoped to be able to avoid suing the agency over the matter. Mr. Gallagher said he would investigate the matter and respond with the position of the State Department.** (Paul Aff. 8, Tel. Appx. at 13.)

Defendant contests that the use was unauthorized because Mr. Daugherity's March 12, 2003, letter provides that Telenor will provide service for use other than for purposes of the DART program, at "agreed upon service rates." Def. App. 8.

22. [Telenor] **By letter dated June 9, 2004, from Mr. Gallagher to Ms. Spencer, Mr. Gallagher stated in part as follows:**

> **Following my meeting with you and Larry Paul on May 11, I have attempted to determine the position of the Department of State with respect to the excessive use of Nera Immarset [sic] GAN terminals loaned by Telenor to Reid A. Daugherty, a civil service employee of the Department of State.**
>
> **I have met with Mr. Daugherty and with Leona Coulombe, the Executive Director of the Bureau for Intelligence and Research where Mr. Daugherty is employed. My discussions with them confirms [sic] my understanding that Mr. Daugherty was acting at all times in good faith and within the scope of his employment with the Department of State. I have found no reason to question Mr. Daugherty's actual authority to sign the letter of March 12, 2003 to Ms. Horncastle . . . .**

(Tel. Appx. 2-3.)

23. [Telenor] **At all relevant times, the Department of State position description for Mr. Daugherty's position has read in relevant part as follows:**[1]

---

[1] The position description uses both bold text and italics, and so, to show that accurately, the entire quotation has not been put in bold as requested in the Special Procedures Order.

Foreign Affairs Research Analyst, GS-0130-14

. . . .

Primary Purpose: The incumbent of this position is an expert foreign affairs intelligence analyst responsible for providing all-source intelligence analysis on complex humanitarian emergencies and natural disasters, including contingency planning, implementing response mechanisms, managing interagency information sharing, and conducting comparative assessments. This position will serve as a deputy division chief of a unit with the responsibility for both interagency liaison functions and managing a small staff of analysts.

. . . .

2.) Represents Bureau or Department 20%

***Participates actively in bilateral and multilateral negotiations and information exchanges and provides authoritative intelligence assessments and related information to delegation heads and senior officials. . . .***
Areas of expertise include both man-made and natural disaster, emergency response, civil-military relations and coordination mechanisms, support for diplomacy abroad, population displacements, and the field-based coordination of geographic information databases.

. . . Serves as a primary point of contact with the Office of the Secretary and as a ***direct focal point in the Department on all matters relating to area of expertise.*** . . .
. . . .

3.) Serves as Bureau's or Department's Action Office [sic] 20%

***Serves as the Department's lead officer in implementing intelligence support for a treaty or agreement on one or more complex, highly sensitive programs involving global, regional and country-specific issues.***

Areas of responsibility include managing the U.S. Governments' [sic] interagency coordination of humanitarian information . . . .

. . . .

4.) Advises Departmental and USG Policymaking Officials and Staffs 20%

. . . .
Areas of responsibility include . . . working with other U.S. Government technical agencies on standards and new technologies related to the mitigation of and response to complex humanitarian emergencies.

. . . Initiates and develops, personally or through the efforts of others, briefings and follow-up meetings involving key officials from other bureaus, other agencies, Congressional staff, or special interest groups.

Factor 1-8 . . .
Knowledge Required by the Position

. . . .

Skill in oral and written communication to prepare and defend analyses, provide guidance, solicit information, defend proposals, and negotiate agreements.

Factor 2-5 . . .
Supervisory Controls

. . . .

Assumes responsibility for planning, coordinating, and carrying out projects and informs the supervisor as appropriate.

. . . .

Factor 5-5 . . .
Scope and Effect

. . . The scope of the assignment area is substantial and includes: . . . planning and carrying out special research studies that address critical issues of broad scope and impact.

. . .

Factor 6-3 . . .
Personal Contacts

Contacts are with Bureau employees at all levels, including the Assistant Secretary, policy analysts and managers in other bureaus; personnel at US posts worldwide; senior analysts and officials in other agencies; congressional staff; experts, consultants, researchers, and educators in the specialty field; and officials of non-governmental organizations. Contacts occur in a wide variety of planned/unplanned, formal/informal settings . . . .

Factor 7-3 . . .
Purpose of Contacts

Contacts are to exchange information, present analyses, provide guidance, plan[,] organize, and coordinate activities, establish liaison, represent the Bureau, resolve problems, and respond to urgent developments. . . .

. . . .

(Bold and italics in original.) (Tel. Appx. at 4-9.)

24. [Telenor] **Mr. Daugherity's position description ~~specifies his delegations of authority~~.** (Tel. Appx. at 4-9.)

Defendant object because Mr. Daugherity's position description does not discuss the concept of "authority;" rather, it describes the duties of the incumbent of the position that he holds. Tel. Appx. at 4-9.

25. [Telenor] **Mr. Daugherity during all relevant periods did not possess a procurement contracting officer's warrant.** (Rindner Decl. 3, U.S. Appx. at 2.)

26. [Defendant] ~~**Mr. Daugherity's primary duties are to provide intelligence analysis to the State Department.**~~ Def. App. 3 ¶ 2.

Telenor objects to this description of Mr. Daugherity's "primary duties," as those are stated in his position description under "Primary Purpose" and are much more comprehensive than summarized above. (Telenor Appx. at 4.)

27. [Defendant] **Mr. Daugherity's position description was drafted to allow him to participate in foreign policy negotiations, plan and execute internal Government projects and meet internal Government deadlines, and act as a resource for information.** Def. App. 12 ¶ 5; 14 ¶ 7; 15 ¶ 9.

Telenor objects only to an inference that these are the sum total of the responsibilities and authority of Mr. Daugherity under his position description. (Telenor Appx. at 4-9.) Telenor does not waive its motion to strike testimony about the intent of the drafters of the position description.

28. [Defendant] **The State Department has never delegated, or intended to delegate, contracting authority to Mr. Daugherity.** Def. App. 1-2 ¶ 3; 9 ¶ 4; 11 ¶ 3; 12 ¶ 5; 14 ¶ 7; 15 ¶ 9.

Telenor has no objection if "contracting authority" is understood as "procurement contracting authority." If it is intended to be construed more broadly to include non-procurement contracting authority, it is inconsistent with Mr. Daugherity's position description as explained in Telenor's briefs. (Telenor Appx. at 4-9.) This ambiguity is eliminated in Telenor's proposed finding at no. 25 above.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 514-4325
Facsimile: (202) 514-7965

OF COUNSEL:
ONA M. HAHS
Attorney-Adviser
Department of State

Attorneys for Defendant

February 21, 2006

FREDERICK W. CLAYBROOK, JR.
Counsel of Record
Crowell & Moring LLP
1001 Penn. Ave., N.W.
Washington, D.C. 20004-2595
(202) 624-2500

Attorney for Plaintiff

February 21, 2006

Certificate of Filing

I hereby certify that on February 21, 2006, a copy of the foregoing Consolidated Statement of Uncontroverted Facts in Support of Cross-motions for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.