IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TELENOR SATELLITE SERVICES, INC., Plaintiff, v. UNITED STATES, Defendant. | No. 05-528C<br>Baskir, J. |

TELENOR'S SUPPLEMENTAL BRIEF
ON AUTHORITY OF WOOD AND SCHWARTZ

Frederick W. Claybrook, Jr.
(Counsel of Record)

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500

Of Counsel

Barbara L. Spencer, Esq.
General Counsel
Telenor Satellite Services, Inc.
1101 Wootton Parkway, 10th Floor
Rockville, Maryland 20852

April 12, 2006

# TABLE OF CONTENTS

Page

I. Sec. Wood Had Authority ........ 2

II. Director Schwartz (and, Thus, Sec. Wood) Had Authority ........ 4

III. Others Might Have Ratified as Well ........ 6

Conclusion ........ 10

# TABLE OF AUTHORITIES

Page

Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................7

*Bianchi v. United States*,
68 Fed. Cl. 442 (2005)...................................................................7

***California v. United States*,**
271 F.3d 1377 (Fed. Cir. 2001) .....................................................8

***Celotex Corp. v. Catrett*,**
477 U.S. 317 (1986) ....................................................................7

*Continental Can Co. USA, Inc. v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) .....................................................7

*Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) .......................................................7

Statutes and Regulations

48 C.F.R. § 601.602-1(b).................................................................6

**1 FAM 014.7.b** ...............................................................................4, 8

1 FAM 433.a .....................................................................................2

28 U.S.C. § 1491(b).........................................................................7

The government's submission of documentation regarding the authority of Sec. Wood and Director Schwartz is incomplete, but what it has provided is adequate to show that Sec. Wood had authority to ratify the non-procurement agreement Mr. Daugherity signed. The authority to conduct the business of the Department was given by the President to the Secretary of State. (U.S. Supp. Appx. at 41.) The Secretary, in turn, gave plenary power to the Assistant Secretaries of State and their Deputies to fulfill their defined missions, the only exception being if some of that authority was specifically withheld. As a general proposition, authority for acquisition contracting is withheld from all except procurement contracting officers (U.S. Supp. Appx. at 42-49), but Telenor's bailment agreement is not an acquisition contract. No other type of contracting authority was withheld from Sec. Wood and those he supervised in his bureau.

The issue, then, boils down to whether Sec. Wood and those he supervised had authority to research and collect information, rather than just to analyze it. The authority to do more than just analysis is inherent in the statement of authority in the Foreign Affairs Manual for the Deputy Assistant Secretary for Analysis (whose full title includes "and Information Management"). The FAM provides that he "[m]anages a comprehensive program of current and long-term intelligence analysis for the Department,

based on information from all sources . . . ." 1 FAM 433.a (emphasis added) (Tel. Appx. at 32). That Sec. Wood had authority under this provision to conduct research and to collect information is made explicit in the internal paperwork of the Department.

I. Sec. Wood Had Authority

Sec. Wood's position description makes explicit his authority to have produced, developed, and collected source information of the type involved in the Telenor bailment:

(a) His full title was "Deputy Assistant Secretary for Analysis and Information Management." (U.S. Supp. Appx. at 6-8 (emphasis added throughout).)

(b) He was charged with "responsibility for providing leadership and direction in the development, coordination, and implementation of a comprehensive intelligence production program . . . ." (U.S. Supp. Appx. at 8.)

(c) He had "primary responsibility" for "information management, including electronic dissemination of intelligence products in Washington . . . ." (U.S. Supp. Appx. at 8.)

(d) He was "responsible for the development, coordination, and oversight of regional and functional intelligence matters for the Bureau." (U.S. Supp. Appx. at 8.)

(e) He "[p]lan[ned] and supervise[d] the production of the bureau's current intelligence and in-depth research. The incumbent [was] thus responsible for the preparation of spot reports, quick reaction analyses, . . . and studies on political, economic, and sociological developments within the purview of the offices listed above." (U.S. Supp. Appx. at 8.)

(f) He "[u]ndert[ook] special assignments . . ., including implementation of a comprehensive information management system for the Bureau that . . . [would provide] more effective electronic dissemination of intelligence to Department policymakers." (U.S. Supp. Appx. at 9.)

Sec. Wood also served as "Geographer" in March 2003 (when the bailment agreement was signed and ratified). (See U.S. Supp. Appx. at 8 (Geographer duties deleted from Sec. Wood's position description in October 2004), 15 (Geographer part of his functions as of March 2003 evaluation).) That position also involved collection of information:

(g) The Geographer was "responsible for the maintenance of effective relations with counterparts in the collection and research components of other US intelligence agencies and [was] responsive to work requirements that result from INR's membership in the intelligence community . . . ." (U.S. Supp. Appx. at 13.)

Humanitarian concerns were well within his purview. In Sec. Wood's SES Performance Agreement, his duties as supervisor of the Humanitarian Information Unit are mentioned (although the government provided incomplete information about those responsibilities):

(h) He "supervise[d] the work of INR's offices of Analysis for Africa, Global Issues, and Geographic Information and Imagery Support, as well as the interagency Humanitarian Information Unit . . . and the office of Information Systems." (U.S. Supp. Appx. at 15.)

According to the State Department website, the Humanitarian Information Unit:

(i) "Collects timely, verifiable, and relevant data utilizing an extensive network of information partnerships." (Tel. Supp. Appx. at 6.)

(j) "Collect[s], analyze[s], and disseminate[s] unclassified information critical to . . . decision-makers and partners in preparation for and response to humanitarian emergencies worldwide . . . ." (Tel. Supp. Appx. at 6.)

The government did not supply Sec. Wood's "SES Evaluation" document with its recent submission, but it had earlier provided it to Telenor in a supplemental Rule 26 disclosure. It is attached in Telenor's supplemental appendix, and it underscores Sec. Wood's authority to have produced and gathered intelligence information:

(k) The Deputy Assistant Secretary for Analysis and Information Management was "responsible for the development, implementation and direction of a comprehensive intelligence production program . . . ." (Tel. Supp. Appx. at 1.)

(l) "The incumbent [was] primarily responsible for supervising and performing work concerned with the collection, analysis, evaluation and interpretation of information . . . and for information management, including electronic dissemination of intelligence products in Washington . . . ." (Tel. Supp. Appx. at 1.)

## II. Director Schwartz (and, Thus, Sec. Wood) Had Authority

Based on the materials provided by the government, Director Schwartz had authority as well. And if he did, so did his supervisor, Sec. Wood, because "[a]uthority vested in an individual position becomes a part of the authority of each position in the direct line of supervision above that position . . . ." 1 FAM 014.7.b (Tel. Appx. at 27-28).

The relevant position description for Mr. Schwartz as of 2003 was that for "Supervisory Geographer." (U.S. Supp. Appx. at 26-33.) It fully demonstrates his authority to have entered into non-procurement contracts for the gathering of humanitarian intelligence information:

(a) Mr. Schwartz's position title was "Deputy Director, Office of the Geographer and Global Issues, Bureau of Intelligence and Research." (U.S. Supp. Appx. at 27.)

(b) He "serve[d] as the senior U.S. government expert on intelligence and geographic aspects of global issues and humanitarian crises . . . ." (U.S. Supp. Appx. at 28.)

(c) He was required to have "[s]kill in oral and written communication to . . . negotiate agreements." (U.S. Supp. Appx. at 30 (note, there is no requirement for approval of what he negotiated).)

(d) His work was to "provide[ ] policy makers with authoritative information and analyses . . . ." (U.S. Supp. Appx. at 31.)

(e) The purpose of his contacts with others included "to coordinate major research and analytical efforts for the solution of important public policy questions." (U.S. Supp. Appx. at 31.)

In Mr. Schwartz's Employee Performance Plan of March 2003 (signed by Sec. Wood), his duties for supporting research projects of the type involved here, including with USAID, is confirmed:

(f) He "[m]anage[d] all current intelligence briefs and bureau research support for senior principals in: Population, Refugees, and Migration Bureau; . . . and the U.S. Agency for International Development, including its Bureau of Humanitarian Response." (U.S. Supp. Appx. at 35.)

(*See also* U.S. Supp. Appx. at 38 (Daugherity Employee Performance Plan, in which his duties included "[c]ollect[ing] and organiz[ing] current intelligence and open source information" and providing support "for USAID's Bureau of Democracy, Conflicts, and Humanitarian Assistance, particularly its [ ] Office of Foreign Disaster Assistance" and, "as needed, to INR's Humanitarian Information Unit."))

The government previously provided in a supplemental Rule 26 disclosure (but not in the most recent submission) an "SES Evaluation Statement" for Mr. Schwartz's position. That statement provides,

(g) "The Office Director for INR/GGI [Geographer and Global Issues] head[ed] a professional intelligence research program covering a major functional area with responsibility for the initiation of intelligence collection activities and the analysis and interpretation of intelligence material relating to: . . . humanitarian crises and complex emergencies . . . ." (Tel. Supp. Appx. at 3.)

## III. Others Might Have Ratified as Well

The uncontested facts disclose that Sec. Wood ratified the agreement, and the State Department regulations, supplemented by other internal documents by order of the Court, now demonstrate unequivocally that Sec. Wood had authority to negotiate a bailment agreement with Telenor to have it assist with the collection of intelligence on a humanitarian crisis project. Only acquisition contracting was carved out of Sec. Wood's authority by regulation. *See* 48 C.F.R. § 601.602-1(b) (Procurement

Executive and contracting officers have authority for contracting involving "the expenditure of funds involved in the acquisition of real and personal property [and] services") (U.S. Supp. Appx. at 45). But the bailment did not involve acquisition, and so this carve-out is irrelevant here.

The primary purpose of summary judgment is to save the time and expense of discovery and a full trial when it is unnecessary because sufficient material facts are not in dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Continental Can Co. USA, Inc. v. Monsanto Co*., 948 F.2d 1264, 1265 (Fed. Cir. 1991); *Bianchi v. United States* 68 Fed. Cl. 442, 464-65 (2005). Even when a party to the litigation could prove its case under several different theories, summary judgment is proper "when only one outcome can ensue." *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.,* 200 F.3d 795, 806 (Fed. Cir. 1999). Here, Telenor can prevail under several theories. However, summary judgment should be granted because the record is adequate to demonstrate that there is no genuine issue of material fact on two grounds, Mr. Daugherity's authority per his position description and ratification by Sec. Wood.[1] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

---

1 In this case, summary judgment for Telenor is proper not because all the relevant facts are known (as in a bid protest action arising under 28 U.S.C. § 1491(b) and reviewed under the APA standard). Rather,

Even if summary judgment were not appropriate for Telenor, the record does not support summary judgment for the government. "The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion; each must be independently assessed on its own merit." *California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001). Indeed, there are several other factual scenarios that would allow Telenor to prevail on the authority issue, and information in addition to what the government has already provided would be needed to explore those scenarios fully.

First, even if what the government has produced were not considered conclusive to show that Sec. Wood had authority to enter into a bailment contract, it has not established that he did not. For example, the government failed to produce the "Functional Statements" for the relevant offices, even though these are expressly called out in the FAM (and referenced in Telenor's 56(f) affidavit). The FAM specifies that they "constitute official delegations of authority for the Department." 1 FAM 014.7.b (Tel. Appx. at 27). Clearly, other relevant documents concerning authority exist.

---

summary judgment for Telenor is proper because enough facts are known to determine that there are no material issues left open with respect to the authority delegated to Mr. Daugherity and Sec. Wood.

Second, the government cannot foreclose the possibility that others within the State Department besides Sec. Wood may have reviewed and ratified the bailment agreement, e.g., Sec. Wood's supervisor (the Assistant Secretary of the Bureau of Intelligence and Research) and/or Ms. Leona Coulombe, the Executive Director for the Bureau. Although the government provided the position descriptions for both these individuals in its recent submission, it has not explained any role they did (or did not) have in the bailment negotiations. (We do know that the State Department lawyer, Mr. Gallagher, questioned Ms. Coulombe in investigating Mr. Daugherity's authority to enter into the bailment agreement, as Mr. Gallagher reported in 2004.) (Tel. Appx. at 2.) Only discovery can ferret this out.

Third, even assuming *arguendo* that someone with <u>acquisition</u> authority must ratify the agreement, the government cannot establish that such act has not already occurred. It is possible that either Director Schwartz or Sec. Wood held a procurement warrant (Mr. Rindner did not deny it in his declaration), and it is also probable that Ms. Coulombe holds a warrant (her position description explains that she is responsible for leading "all organizational segments of the bureau regarding such

management activities as . . . procurement and contracting . . . ." (U.S. Supp. Appx. at 19.)).

## Conclusion

Mr. Daugherity had express and implied authority to negotiate the non-acquisition, bailment agreement with Telenor, without supervisory approval. That alone is sufficient to find in Telenor's favor. But Mr. Daugherity also got approval of the agreement from Sec. Wood (and probably others), and so Sec. Wood (at least) ratified the bailment agreement. The government has not produced all relevant documentary materials on the authority issue, but it has produced enough to show that Sec. Wood was authorized to ratify the bailment agreement with Telenor, and so partial summary judgment must be granted for Telenor on this ground as well.

Respectfully submitted,

/s/ Frederick W. Claybrook, Jr.

Frederick W. Claybrook, Jr.
(Counsel of Record)
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 624-2500

April 12, 2006

DCIWDMS: 2744691_1