# In the United States Court of Federal Claims

Case No. 05-528C
(Filed: June 2, 2006)
TO BE PUBLISHED

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | * Bailment contract, Government |
| **TELENOR SATELLITE SERVICES, INC.,** | * employees' express and implied |
| *Plaintiff,* | * contracting authority, contract |
| | * ratification, duties of various State |
| v. | * Department officials |
| | * |
| **THE UNITED STATES OF AMERICA,** | * |
| *Defendant.* | * |
| | * |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | * |

***Frederick W. Claybrook, Jr.***, Crowell & Moring LLP, Washington, D.C., attorney of record for Plaintiff. ***Barbara L. Spencer***, General Counsel, Telenor Satellite Services, Inc., Rockville, Maryland, of counsel.

***Timothy P. McIlmail***, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant. With him on the briefs were ***David M. Cohen***, Director, ***Patricia M. McCarthy***, Assistant Director, and ***Peter D. Keisler***, Assistant Attorney General.

***Sarah Leigh Martin***, law clerk.

## OPINION

**BASKIR, Judge**.

This is a breach of contract case arising out of an alleged bailment contract between Telenor Satellite Services, Inc. ("Telenor") and the U.S. Department of State. The cross motions for partial summary judgment focus on whether the State Department employees who entered into the arrangement with Telenor had the authority to bind the Government in a bailment contract for the temporary use of electronic equipment. The Court concludes that the contract was ratified by an official who had authority to bind the Department. **Therefore, Plaintiff's Motion for Partial Summary Judgment is GRANTED, and the Defendant's Cross Motion is DENIED.**

**BACKGROUND:**

As we will explore in greater detail below, the existence of the authority to contract on behalf of the Government is determined by the responsibilities of the persons involved in the transaction. Consequently, we first set out the official descriptions of the duties of these people, beginning with a brief statement describing the organizational structure of the Department of State ("the Department" or "State Department").

**I. The People**

The State Department is organized into several Bureaus, including the Bureau of Intelligence and Research ("INR"). Bureaus are usually headed by an Assistant Secretary, often with the assistance of at least one Deputy Assistant Secretary. Some Bureaus are further divided into Offices, which are headed by Directors. One such Office of the INR is the Office of the Geographer and Global Issues ("GGI"). During the periods of time relevant to this case, Mr. William Wood was the Deputy Assistant Secretary ("DAS") for the Bureau of INR, and supervisor of Mr. Lee Schwartz, who was the Acting Director of the Office of GGI of INR and also supervisor of Mr. Reid A. Daugherity, an officer within GGI.

A. William Wood

Mr. Wood's formal title was the "Deputy Assistant Secretary for Analysis and Information Management." Supp. App. at 8. The Foreign Affairs Manual ("FAM," the manual describing the basic organization and functions of the State Department) provides that in general, a Deputy Assistant Secretary "participates with the principal in carrying out the full range of management responsibilities and acts with full authority over the total work of the organization during the principal's unavailability or absence." 1 FAM 014.6(c)(1), Pl. App. at 26. The FAM provisions also provide that Deputy Assistant Secretaries are responsible for overseeing the "major functions" of their Bureaus, which in turn "administer one or more major functions of the Department." 1 FAM 014.3(b), Pl. App. at 24.

Further, 1 FAM 431.1 states that the Assistant Secretary for Intelligence and Research (and the Deputy Assistant Secretary in his absence, *see* Pl. App. at 26), among other things, "directs the Department's program of research and analysis," represents "the Secretary of State in the Intelligence Community," "[i]ssues all taskings from the Department to intelligence agencies for intelligence," and "[m]aintains information management systems." Pl. App. at 30. According to 1 FAM 433(a), the Deputy Assistant Secretary for Analysis (here, Mr. Wood):

> Manages a comprehensive program of current and long-term intelligence analysis for the Department, based on information from all sources for the Secretary and the Department's principal policy officers.

Pl. App. at 32. He also "[d]irectly supervises 9 offices and one staff, as directed by the Assistant Secretary." 1 FAM 433(b), Pl. App. at 32.

Mr. Wood's position description further describes his duties. *See* Supp. App. at 6-9. Among other things, it states that he has:

> responsibility for providing leadership and direction in the development, coordination, and implementation of a comprehensive intelligence production program for the Department of State on Africa and Global Issues. The incumbent also has primary responsibility for providing geographic and imagery support to diplomacy and for information management, including electronic dissemination of intelligence products in Washington, and to overseas posts.

Supp. App. at 8. Mr. Wood was responsible for "the development, coordination, and oversight of regional and functional intelligence matters for the Bureau." *Id.* He was also responsible for undertaking special projects for the Assistant Secretary, such as "implementation of a comprehensive information management system for the Bureau that will significantly increase access to the Internet and more effective electronic dissemination of intelligence to Department policymakers." *Id.* at 9. Mr. Wood's authority was "subject only to the broad executive direction of the Assistant Secretary." *Id.*

B. Lee Schwartz

Mr. Schwartz has been the Acting Director of the Office of GGI in the Bureau of INR since 2002. The Foreign Affairs Manual, 1 FAM 014.3(c), provides that Offices "are responsible for a complete functional field." Pl. App. at 24. The Office of the Geographer and Global Issues analyzes issues, determines official geographic nomenclature, advises the Government about geographic matters, and serves as the Geographer of the United States. 1 FAM 433.3, Pl. App. at 33.

Among other things, Mr. Schwartz' position description states that he "[d]irects the use of geographic information system applications in support of humanitarian and diplomatic objectives." Supp. App. at 28. Under "Purpose of Contacts," his position description also provides that he is "to coordinate major research and analytical efforts for the solution of important public policy questions." *Id.* at 31.

C. Reid Daugherity

Mr. Daugherity was, during all times relevant to this litigation, a Foreign Affairs Research Analyst in the Office of GGI at INR. As a research analyst, he was responsible for "providing all-source intelligence analysis" in various areas, including humanitarian emergencies and disaster relief. Research Analyst Position Description, Pl. App. at 4. In his declaration, Mr. Daugherity summarizes his job duties as follows:

> My duties are to carry out current and in-depth intelligence analysis of complex emergencies and humanitarian crises, brief senior policy makers at the Department of State regarding those impending and current emergencies and crises, coordinate intelligence community products with the Untied States intelligence community, and monitor multilateral and geopolitical issues to determine where and when a humanitarian crisis might arise.

Def. App. at 3.

More specific to the instant case, Mr. Daugherity's position description delineates the following duties, in relevant part:

> Participates actively in bilateral and multilateral negotiations and information exchanges. . .
>
> Serves as a primary point of contact with the Office of the Secretary and as a direct focal point in the Department on all matters relating to area of expertise. . .
>
> Serves as the Department's lead officer in implementing intelligence support for a treaty or agreement. . . [on programs] involving global, regional and country-specific issues. . .
>
> Serves as principal advisor for intelligence matters in bilateral and multilateral meetings where program issues are negotiated. . .
>
> Assumes responsibility for planning, coordinating, and carrying out projects and informs the supervisor as appropriate.

Pl. App. at 5-7 (emphasis removed). The Department describes the requirements for the position to include "oral and written communication [skills] to prepare and defend analyses, provide guidance, solicit information, defend proposals, and *negotiate agreements*." Pl. App. at 7 (emphasis added).

Mr. Daugherity has never possessed a procurement contracting officer's warrant. Such warrants give employees the formal authority to enter into procurement contracts on behalf of the Government, and are delegated in writing only to certain employees involved in the procurement process.

**II. The Transaction**

In January 2003, DAS Wood informed Mr. Daugherity of an arrangement by which the U.S. Agency for International Development ("USAID") Disaster Assistance Response Team ("DART") pilot project would transmit and receive humanitarian data from Iraq to Washington, D.C., via satellite transmission using portable computer terminals in the field. The arrangement had been reached by Global Relief Technologies, a consortium that included Telenor. Mr. Wood told Mr. Daugherity that he would be responsible for testing the concept while serving on DART. We know little of what transpired between Mr. Wood and Mr. Daugherity at this meeting. It is possible that Mr. Wood delegated authority to Mr. Daugherity for the Telenor arrangement, or, indeed, that Mr. Wood had previously agreed to the transaction with Telenor.

In March, Acting Director Schwartz told Mr. Daugherity to meet with the Plaintiff, Telenor, concerning the DART project. At the meeting in March, Telenor's Director of Business Development, Mr. Paul, informed Mr. Daugherity that Telenor was willing to provide the equipment, free of charge, for the data transmission for the Project, subject to a few conditions: (a) the equipment was only to be used for the DART pilot program, (b) the equipment would be used only for two months and then returned to Telenor, (c) any use after two months needed authorization by Telenor, and (d) the terms of the agreement needed to be put in writing by the State Department.

Mr. Daugherity began training on the Telenor satellite communications equipment on March 13, 2003. On this day, Mr. Daugherity signed a letter, provided to him by Mr. Paul and dated March 12, 2003, addressed to the President of Telenor, Mr. Horncastle. The letter confirmed the receipt of the Telenor satellite communications equipment, consisting of four Global Area Network ("GAN") terminals, for the DART pilot program. At Mr. Paul's request, Mr. Daugherity later copied the letter onto Department of State letterhead and faxed it to Telenor. The letter specifically confirmed the conditions required by Mr. Paul, specifying a limited, two-month use of the equipment starting in mid-March 2003. The letter was not signed by any Telenor representative.

On March 17, 2003, DAS Wood attended a meeting with Mr. Paul, Mr. Daugherity, and others. At the meeting, Mr. Wood expressed to Mr. Paul his appreciation and approval of Telenor's participation in the DART pilot program. Mr. Paul's testimony confirms that Mr. Wood at that meeting expressed his knowledge

that Mr. Daugherity was taking Telenor's equipment to Iraq pursuant to the conditions in Mr. Daugherity's March 12 letter. Mr. Wood's actions at this meeting constitute ratification of the agreement framed by Mr. Daugherity, as we shall discuss below.

**III. The Alleged Breach**

On March 21, 2003, Telenor delivered four GAN terminals, at no charge, to the Department of State. Mr. Daugherity then took them to Iraq for purposes of the pilot project. The DART pilot program used the equipment through May 2003, at which time the State Department left two of the four terminals in the possession of the Army in Iraq.

From May through June 10, 2003, the U.S. Army allegedly began using Telenor's terminals for purposes unconnected with the DART program, without Telenor's knowledge or consent. On June 11, 2003, after discovering the allegedly unauthorized use, Telenor shut off transmission capability of the equipment. Later that month, Telenor sent the State Department an invoice for the satellite telecommunications services provided outside the DART pilot program, charged at Telenor's standard published service rates. The State Department did not pay the invoice.

On May 11, 2004, Telenor representatives met with the State Department counsel, Mr. Dennis Gallagher, informing him that the amounts involved in the invoice were too large to be ignored and expressed their desire to avoid litigation if possible. On June 9, 2004, Mr. Gallagher sent a letter to the Telenor representatives concerning the use of Telenor's terminals outside the DART program. Mr. Gallagher expressed his "understanding that Mr. Daugherity was acting at all times in good faith and within the scope of his employment with the Department of State," and that he "found no reason to question Mr. Daugherity's actual authority to sign the letter of March 12, 2003." Pl. App. at 2. However, he asserted that the Department had not breached any agreement. It had exercised "reasonable [care]" over the equipment, so it was not liable for any excessive use of the terminals. *Id.* at 3.

On May 6, 2005, Telenor filed suit in the U.S. Court of Federal Claims. Plaintiff filed a motion for partial summary judgment, followed by Defendant's opposition and cross motion for summary judgment. The parties completed briefing on their cross motions on February 21. The Court held an oral argument on March 22. In response to the Court's request, the parties filed supplemental briefs on the issue of the contracting authority of Mr. Wood and Mr. Schwartz. The last brief was filed on May 3.

There are no material facts in dispute as regards the pending motions. In the Consolidated Statement of Uncontroverted Facts ("CSUF"), filed by the parties on February 21, 2006, the Defendant argues that the Plaintiff fails to support certain facts with any evidence outside the pleadings. CSUF ¶¶ 14, 16, 17. The unsupported facts concern Defendant's alleged use and misuse of Telenor's communications equipment.

These facts, while important to the case, are not material or even relevant to the issue before the Court on the instant cross-motions for summary judgment. These address only Mr. Daugherity's authority to contract and, if none, whether the agreement was ratified by someone with contracting authority.

## ANALYSIS

### I. Standard of Review

This case comes before the Court on cross motions for summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In making this determination, the Court must resolve all reasonable inferences in favor of the non-moving party. *Champagne v. United States*, 35 Fed. Cl. 198, 206 (1996). When, as here, there are cross-motions for summary judgment, the Court must evaluate each motion individually, making inferences against the moving party with respect to each motion. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001).

### II. Jurisdiction, Bailment Contracts, and Authority

The parties agree that this case is not governed by the Contract Disputes Act because it does not involve a contract for the procurement of goods or services. Rather, it involves an alleged bailment contract for the possession and use of certain electronic transmission equipment. The Tucker Act, 28 U.S.C. § 1491(a)(1), gives the U.S. Court of Federal Claims jurisdiction over claims founded upon "any express or implied contract with the United States." This provision of the Tucker Act, coupled with a properly-alleged Government contract, satisfies the federal Government's waiver of sovereign immunity, giving this Court jurisdiction over the Plaintiff's claim. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

The U.S. Court of Claims has described a bailment contract as follows:

> A bailment relationship is said to arise where an owner, while retaining title, delivers personalty to another for some particular purpose upon an express or implied contract. The relationship includes a return of the goods to the owner or a subsequent disposition in accordance with his instructions.

*Lionberger v. United States*, 178 Ct. Cl. 151, 167 (1967). To prove a bailment contract, the Plaintiff must meet the traditional elements of a Government contract. *Hoffman v. United States*, 266 F. Supp. 2d 27, 39 (D.D.C. 2003) (citing *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir. 1984)). The Plaintiff must prove that an

authorized Government official made a promise, representation, or statement that the Plaintiff's personal property would be returned as directed. *See Ysasi v. Rivkind*, 856 F.2d 1520, 1525 (Fed. Cir. 1988) (citing *Shaw v. United States*, 8 Cl. Ct. 796, 799 (1985)).

In order to establish a contract between a private party and the Federal Government, whether express or implied-in-fact, a party must prove the following elements: 1) mutual intent to contract, 2) offer and acceptance, 3) consideration, and 4) that the Government representative who entered into or ratified the agreement had actual authority to bind the United States. *Trauma Serv. Group*, 104 F.3d at 1325. Even though a bailment contract may be implied-in-fact, the Plaintiff must still show "that the officer whose conduct is relied upon had actual authority to bind the government in contract." *Hoffman*, 266 F. Supp. 2d at 39 (quoting *H.F. Allen Orchards*, 749 F.2d at 1575); *see also Leonardo v. United States*, 60 Fed. Cl. 126 (2004) ("*Leonardo II*") (requiring proof of contracting authority for bailment contract).

It is not sufficient to show that the Government employee had apparent authority or held out to have such authority; the employee must actually have had the authority to bind the Government. *Cruz-Pagan v. United States*, 35 Fed. Cl. 59, 60 (1996); *see also Janowsky v. United States*, 133 F.3d 888, 891 (Fed. Cir. 1998). Although the rule may seem harsh, it is clear that a private party contracting with the Government bears the responsibility of ensuring that the Government official with whom it contracts actually has the authority to enter into such an agreement on behalf of the United States. *Trauma Serv. Group*, 104 F.3d at 1325. This rule helps to protect the public treasury from abuse. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). *But see Brunner v. United States*, No. 98-554C, 2006 WL 1189492 (Fed. Cl. May 2, 2006) (explaining that there is no justification for applying this stricter rule to contracts with the Government).

## III. Ratification

In its Reply Brief and Opposition to Defendant's Cross Motion for Summary Judgment, Plaintiff for the first time argues that even if Mr. Daugherity lacked the authority to bind the Government in contract, persons with such authority ratified the bailment contract in this case. Pl. Rep. at 7. Plaintiff argues specifically that Mr. William Wood, INR Deputy Assistant Secretary for Analysis and Information Management, had the necessary authority and approved of the terms of the bailment contract. We agree.

The Federal Circuit has stated, "Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" *Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (quoting Restatement (Second) of Agency § 82 (1958)). Ratification can only occur if

the person with authority has knowledge of the activity. *See id.* (discussing Congressional ratification of agency conduct). Put another way, the person with contracting authority must actually or constructively know about and explicitly or impliedly adopt the contract in question. *Dolmatch Group, Ltd. v. United States*, 40 Fed. Cl. 431, 438 (1998); *Williams v. United States*, 127 F. Supp. 617, 623 (Ct. Cl. 1955); *see also Leonardo v. United States*, 63 Fed. Cl. 552, 560-61 (2005) ("*Leonardo III*"), *aff'd*, 163 Fed. Appx. 880 (Fed. Cir. 2006) (someone with contracting authority must have known all material facts surrounding the unauthorized action and have knowingly confirmed, adopted, or acquiesced to it). Mere presence during discussions is not acquiescence. *Leonardo III*, 63 Fed. Cl. at 561. The Court will first address Mr. Wood's authority to contract, and next, whether he ratified the bailment agreement.

A. Express authority

Actual authority may be express or implied. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989). A Government employee has express authority to bind the Government in contract "only when the Constitution, a regulation, or a statute grants such authority in an unambiguous manner." *Roy v. United States*, 38 Fed. Cl. 184, 188 (1997). This appears to be the test universally applied by this Court to determine whether an employee possesses express authority to contract. *See Leonardo III*, 63 Fed. Cl. at 557; *Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005); *Tracy v. United States*, 55 Fed. Cl. 679, 682 (2003); *Starflight Boats v. United States*, 48 Fed. Cl. 592, 598 (2001); *see also Sam Gray Enters. v. United States*, 43 Fed. Cl. 596 (1999), *aff'd*, 250 F.3d 755 (Fed. Cir. 2000) (table) (examining the relevant statutes and regulations to determine whether the Government employee had express authority to bind the Government in contract).

Plaintiff does not point to a statute or regulation granting contracting authority to Mr. Wood. *See Leonardo III*, 63 Fed. Cl. at 557 (language in a position description is insufficient to establish express contractual authority).

B. Implied authority

1. Implied authority defined

Even where express authority is lacking, a court may find that an employee has implied authority to bind the Government in contract "when such authority is considered to be an integral part of the duties assigned to [the] government employee." *H. Landau*, 886 F.2d at 324 (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 43 (1982)). According to Judge Andewelt of this Court, "integral" means "necessary to form a whole" or "essential to completeness." *Cruz-Pagan*, 35 Fed. Cl. at 61 (quoting Webster's Third International Dictionary 1173 (1981)). Judge Block has characterized authority as "integral" when "the government employee

could not perform his or her assigned tasks without such authority and the relevant agency regulation does not grant such authority to other agency employees." *Flexfab*, 62 Fed. Cl. at 148.

For example, in *Cruz-Pagan*, the court held that DEA agents did not have implied authority to enter into payment agreements with informants in order to secure information because the agents had "reasonably efficient alternatives" to achieve their assigned duties. Authority was not necessary or essential to their jobs. *Cruz-Pagan*, 35 Fed. Cl. at 61. Rather than allow the DEA agents to contract with informants, the agency could require the agents to secure approval from their supervisors. *Id.* Alternatively, the court held that implied actual authority had not been proved because the DEA internal regulations specifically prohibited field agents from promising monetary awards to informants. *Id.* at 62.

Similarly, in *Roy*, the court held that FBI Special Agents did not have implied actual authority to execute compensation agreements on behalf of the Government. 38 Fed. Cl. at 190. Contracting authority was not necessary to achieve the goal of inducing informant cooperation because the agents could instead follow established agency procedures and obtain prior approval for making such payments. *Id.* The court in *Roy* noted that the FBI Manual did not expressly prohibit Special Agents from entering into these agreements, as in *Cruz-Pagan*. *Id.* at 191. Nevertheless, the court held that the regulations embodied in the Manual vested only certain officials with contracting authority, not including Special Agents. *Id.* Thus, it would not be reasonable to imply that the Special Agents had that authority. *Id.*

In *Leonardo III,* Judge Hewitt examined whether two employees of the American Cultural Center of the United States Information Service had the implied authority to contract with artists to exhibit their work. 63 Fed. Cl. 552. After denying both parties' cross-motions for summary judgment, *Leonardo II*, 60 Fed. Cl. 126, and holding a trial on the merits, the court held that the first employee, the assistant to the cultural attache, did not have the authority to obligate the United States. 63 Fed. Cl. at 558. The court reasoned that contracting authority was not necessary for him to perform the duties described in his position description, including planning, organizing, and implementing cultural and informational programs and exhibits. *Id.* Reasonable alternatives existed for that employee to discharge his duties; the agency required him to secure approval from his supervisor before entering into agreements. *Id.*

On the other hand, the court in *Leonardo III* held that the assistant's supervisor, the Cultural Affairs Officer, had implied contracting authority. *Id.* at 559-60. As the overseer of all programs and activities at the American Cultural Center, she was responsible for planning, coordinating, and carrying out all programs in support of the Center's objectives, which included encouraging the use of the facilities for cultural purposes consistent with the "U.S. Missions in Belgium." *Id.* The court held that there was no reasonable alternative but to vest her with the ability to enter into contracts with

professional artists to exhibit their work in furtherance of these goals. *Id.* at 560. An essential element in the analysis of implied authority is, of course, the nature of the commitment being made on behalf of the Government.

In determining whether contracting authority is integral to a Government employee's duties, courts generally examine the nature of the duties assigned to the employee, which are often contained in the employee's job description. *E.g., Dolmatch Group*, 40 Fed. Cl. at 438; *accord Leonardo III*, 63 Fed. Cl. at 558 (examining the employee's job responsibilities and position description). Courts can also consider the job requirements of a particular project. *See Zoubi v. United States*, 25 Cl. Ct. 581, 587-88 (1992) (holding that a program director had the implied authority to contract with interpreters in order to establish a new project he was undertaking). Additionally, courts look to relevant statutes and regulations to determine whether contracting authority has been specifically prohibited, or whether it has been delegated to someone else. *See, e.g., Roy*, 38 Fed. Cl. at 191. Some courts also consider deposition testimony of those familiar with the job in question. *See Cruz-Pagan*, 35 Fed. Cl. at 61.

Defendant argues that implied authority can only be inferred when the employee already has some express contracting authority. Def. Br. at 5-7. Indeed, at least one case from this court has applied this narrow test. *Sam Gray Enters.,* 43 Fed. Cl. at 603 n.10 ("[T]his doctrine applies only when some *contracting* authority was actually delegated.") (emphasis added). However, other cases, including the Federal Circuit case that set forth the test for implied authority, do not mention the requirement stated by Defendant. *See, e.g.*, *H. Landau*, 886 F.2d at 324 (stating the test as whether contracting authority is an integral part of assigned duties). In fact, the court in *Landau* found that implied authority to promise payment to suppliers could exist based on the employee's express authority to administer a subcontract and draw checks on a joint bank account. *Id.*

It is true that some authority, but not necessarily the authority to enter into binding contracts, must have been delegated to the Government employee. *See, e.g.*, *Cal. Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19, 27 (1990), *aff'd*, 937 F.2d 624 (Fed. Cir. 1991) (requiring "some limited, related authority" before a court may imply contracting authority). This is true because in finding that implied authority exists, a court is interpreting the employee's delegated duties to include the ability to bind the Government in contract. *See id.*, *cited in* John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 95 (3d ed. 1998). It is appropriate to do so when the delegated duties are such that they impliedly contain the ability to contract. *See* Cibinic & Nash (3d ed.) at 96 (noting that the employee must have had some authority "to act in the contracting process").

The precise test is the one laid out in *H. Landau*, so we need go no further than to ask whether the ability to contract is an "integral part" of the duties already delegated to the employee, regardless of whether those duties already include the authority to

contract in some respects. 886 F.2d at 324. Although many cases finding implied authority involved an officer who already had authority to contract in certain situations, *see* Cibinic & Nash (3d ed.) at 97 (and cases cited therein), this is not a requirement.

At oral argument, Defendant's counsel stated that implied contracting authority must be traceable to some prior express delegation of contracting authority, and that such has not occurred in this case. Oral Argument Transcript at 45-46. Defendant's argument ignores the Secretary of State's authority, which she may delegate. The Secretary of State clearly has the authority to bind the Government in contract in order to fulfill the duties of the Department, as determined by the President of the United States. *See* 22 U.S.C. § 2656. She may delegate those duties to any person under her authority, and may also delegate the authority to re-delegate those duties. 22 U.S.C. § 2651a(a)(4). Thus, if contracting authority can be implied from Mr. Wood's delegated duties, then it is directly traceable to the Secretary's express authority.

2. Implied authority as applied to Mr. Wood

Given the definitions of express and implied contracting authority set forth above, the Court concludes that Mr. Wood had the implied authority to enter into this bailment contract on behalf of the Government. This agreement, we recall, involved accepting on behalf of the Government the temporary possession and use of highly sophisticated equipment for the limited purpose of a pilot project operation in a war zone.

The FAM provisions cited by Plaintiff, taken together with Mr. Wood's position description, support the conclusion that Mr. Wood had considerable authority in the State Department. He helped to carry out the full range of responsibilities of the State Department's Bureau of Intelligence and Research. He was responsible for overseeing the Bureau's major functions, including developing, managing, and implementing a comprehensive program of intelligence production and analysis. Subject only to the supervision of the Assistant Secretary of State of INR, Mr. Wood had the "primary responsibility" for "information management, including electronic dissemination of intelligence products" in Washington and overseas. DAS Position Description, Supp. App. at 8. More specifically, the Secretary charged him with implementing a "comprehensive information management system . . . that will significantly increase access to the Internet and more effective electronic dissemination of intelligence." *Id.* at 9. The Telenor DART Project fell easily within this responsibility.

The job responsibilities of Mr. Schwartz were also subsumed by Mr. Wood. *See* 1 FAM 014.7(b), Pl. App. at 27-28 ("Authority vested in an individual position becomes a part of the authority of each position in the direct line of supervision above that position . . ."). As Supervisory Geographer of the United States in 2003, Mr. Schwartz was responsible for directing "the use of geographic information system applications in support of humanitarian and diplomatic objectives." Supervisory Geog. Position Description, Supp. App. at 28.

Because Mr. Wood was the primarily responsible person for such information gathering and dissemination, it was necessary for him to be able to enter into temporary expedients with private parties, including non-governmental organizations involved in humanitarian efforts, in order to fulfill his duties. Mr. Wood needed the authority and flexibility to arrange to use privately owned equipment on an *ad hoc*, temporary basis, in order to collect and transmit information. This is especially true given his specific responsibilities related to the electronic collection and dissemination of information via the internet. The Bureau's participation in the DART pilot project was one such information-gathering project, and the bailment agreement for the temporary use of telecommunications equipment was essential to its success. *See* CSUF ¶ 4 ("[T]he pilot project's objective was to use satellite transmission to get humanitarian data . . . from Iraq to Washington, D.C., for real-time compilation and analysis . . .").

While we believe Mr. Wood's responsibilities, indeed his very title – "Deputy Assistant Secretary for Analysis and Information Management" – necessarily imply contracting authority, the existence of that authority is confirmed by the circumstances of the particular contract in this case. This was a temporary loan of equipment for a specific purpose and short duration. We think it is no great reach to imply authority for such an agreement as part of a limited pilot project. It would not be reasonable to conclude that the primary person in charge of information management programs in the Department must obtain approval from another person before borrowing the equipment necessary to implement those programs. *See Leonardo III*, 63 Fed. Cl. at 558 (holding that the person in charge of all programs and activities at the American Cultural Center, but not her assistant, had implied authority to contract in order to fulfill her duties).

C. Mr. Wood's ratification of the agreement

To prove ratification, the Plaintiff must establish that Mr. Wood had knowledge of and approved or adopted the agreement. *See Leonardo III*, 63 Fed. Cl. at 560. In support of its ratification argument, Plaintiff points to three sources of evidence, two of which support its case, and one of which does not. *See* Pl. Rep. at 7.

First, Mr. Daugherity stated in his declaration that Mr. Schwartz arranged for his detail to the DART program and on March 12, 2003, "directed" him to attend a meeting "regarding Telenor's equipment." Def. App. at 4-5. Mr. Daugherity stated that Mr. Wood arranged for a pilot program with Global Relief Technologies, which included Telenor, and told Mr. Daugherity that he would be "responsible for testing this concept" while serving on DART. *Id.* These facts support the ratification theory because they imply Mr. Wood's knowledge of the essentials of Telenor's role in the pilot project.

Second, Mr. Paul, Director of Telenor, stated in his affidavit that he met with Mr. Wood on March 17, 2003, and:

> Mr. Wood at that meeting expressed his knowledge of Telenor's participation in the DART program and expressed his appreciation and approval of that participation. We discussed expressly that Mr. Daugherity would be taking Telenor's equipment to Iraq for the exclusive purpose of the DART program for two months and that Telenor had agreed to this participation upon the conditions stated in Mr. Daugherity's March 12 letter.

Pl. App. at 12.

Mr. Paul's statement satisfies the ratification test. It shows that Mr. Wood knew of and explicitly approved of the bailment arrangement with Telenor. *See Williams*, 127 F. Supp. at 623. Mr. Daugherity's testimony also tends to support the conclusion that both Mr. Wood and Mr. Schwartz were partially responsible for initiating the agreement with Telenor and directed Mr. Daugherity to take it over. The Defendant proffers no evidence to contradict these conclusions.

Plaintiff also cites Mr. Schwartz' declaration, which does not, however, mention any relationship with Telenor and thus does not support Plaintiff's argument. *See* Def. App. at 9-10.

**IV. Mr. Daugherity's Authority to Contract**

The parties spend the bulk of their briefs debating whether Mr. Daugherity had express or implied authority to bind the Government in contract. We note in passing that it is unlikely that Mr. Daugherity had such authority as a general matter. The Plaintiff does not point to a statute, regulation, or Constitutional provision unambiguously granting him express authority. Likewise, his position description fails to establish that the authority to contract was necessary for successful performance of his job, which involves intelligence gathering and sharing. However, the present undeveloped record suggests the possibility that Mr. Daugherity was given sufficient responsibility over the DART program in particular to encompass implied authority for the agreement at hand. Given our conclusion that Mr. Wood ratified the agreement, it is unnecessary for the Court to rule on Mr. Daugherity's authority.

**CONCLUSION:**

The **Plaintiff's Motion for Summary Judgment** on the issue of authority is hereby **GRANTED**, and the **Defendant's cross motion is DENIED**. Mr. Wood had implied authority to enter into contracts of the sort involved here. He ratified Mr. Daugherity's bailment agreement with Telenor when he specifically approved of its terms in a March 2003 meeting.

**The parties are ORDERED to submit a Joint Status Report for further proceedings in this case no later than June 26, 2006.**

IT IS SO ORDERED.

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge