IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TELENOR SATELLITE SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-528C |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

Defendant, the United States, requests that the Court enter judgment in its favor, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), because plaintiff, Telenor Satellite Services, Inc. ("Telenor"), seeks recovery of alleged damages that it could have avoided through reasonable efforts.

STATEMENT OF THE ISSUE

Whether Telenor can recover $378,660.89 for telecommunication service allegedly provided to the Government through Telenor satellite communication terminals after the end of a two-month pilot program, where Telenor could have prevented that alleged loss by simply turning the terminals off when the program ended.

## STATEMENT OF FACTS

Telenor alleges that it lent satellite communications terminals to the Government for a two-month Disaster Assistance Response Team ("DART") pilot program designed to "demonstrate and verify the feasibility of utilizing mobile satellite communication technology to improve coordination of global disaster recovery and reconstruction efforts of governments and non-governmental organizations." Complaint ("Compl.") ¶¶ 1, 6. Telenor further alleges that the Government owes it for using the terminals for other purposes, without permission, after the two-month program ended in 2003 (id. ¶¶ 1, 10), contrary to the terms of what Telenor alleges is a contract between it and the Government. Id. ¶ 5, Compl. Exhibit A.

Lawrence Paul is Telenor's Director of Business Development. Appendix ("App.") 16 at 16-19. He held that position in 2003. Id. at 20-21. Mr. Paul was the source of the language for the alleged contract between Telenor and the Government. Compare App. 1-2 with Compl. Exhibit A.[1]

---

[1] Pages 1-2 of the appendix (T00004-5) reflect a March 11, 2003 communication from Mr. Paul to Michael Gray (the pilot program's point of contact with the Government during at least some of the period March to June 2003, regarding the use of the equipment (App. 41 at 6-14)), regarding the DART pilot program. App. 17 at 20-22; 18 at 1-4.

Although Mr. Paul took the position as late as June 10, 2003, that the pilot program ended on May 31, 2003 (App. 10),[2] Telenor claims that the two-month pilot program ended on May 11, 2003. App. 31.

Telenor seeks $378,660.89 for service allegedly provided through its terminals from May 11 to June 10, 2003. Compl. at 7 ¶ 1, Compl. Exhibit B p. 2. However, on June 10, 2003, at 12:10 p.m., Telenor directed that its staff "bar" the terminals. App. 10. Only 46 minutes later, Telenor's staff reported that the barring of the terminals had been completed. Id. Upon barring, the terminals could not be used. App. 39 at 11-14. Telenor admits that it deactivated the terminals on June 10, 2003. App. 28.

Telenor left the terminals operational after May 11, 2003, for its own business reasons unrelated to the DART pilot program: Telenor knew as early as May 9, 2003, two days before it claims the pilot program ended, that the terminals were possibly being used for purposes other than the pilot program. App. 5.[3] Telenor was able to monitor the Government's use

---

[2] Pages 10-11 of the appendix (T01132-33) reflect communications among Telenor personnel, including Mr. Paul, regarding the DART pilot program. App. 36 at 19-22; 37 at 1, 8-22; 38 at 1-5.

[3] Pages 5-7 of the appendix (T00045-47) reflect communications among Telenor personnel regarding the DART pilot program. App. 21 at 9-14.

of the terminals, and had, in March 2003, declined an offer from its Norwegian affiliate for traffic information regarding the terminals, explaining that "[o]ur operations staff are able to 'see' the traffic . . . so I don't think we will need any further assistance." App. 3.[4]

Telenor had initially monitored traffic for the pilot program every two weeks (App. 13 (Interrogatories Nos. 6 & 7, and responses)) and, on May 8, 2003, obtained updated traffic numbers on the use of the terminals. App. 5-6. The next day, after being informed by Mary Kim Baumgartner, a Telenor employee (App. 13 (Interrogatory No. 6 and response)), that she was concerned that the terminals were being used by the military or Iraqis to make telephone calls to their families, and that such use might not be "in the spirit of our agreement," Mr. Paul advised Telenor's President, Britt-Carina Horncastle (App. 34 at 19-20; 35 at 12-22) that "[i]t may be time to consider putting an end to the DART pilot program." See App. 5.

Telenor, however, decided not to turn the terminals off on May 11, 2003, the date on which it claims the DART pilot program ended, because it believed that the terminals "were supposed to be bought by whoever had

---

[4] Pages 3-4 of the appendix (T00034-35) reflect communications among Telenor personnel regarding the DART pilot program. App. 19 at 5-8; 20 at 6-12.

them." App. 39 at 16-19. Rather than turn the terminals off until they were purchased, Telenor decided that turning them off was "not the kind of thing that you do when the U.S. government has said that they want to buy them and you know that they're in a war zone." App. 40 at 1-7. Telenor eventually barred the terminals because it concluded that it could not afford to wait for the paperwork from the Army to buy the terminals and continue to experience the traffic levels that were occurring regarding the use of the terminals. Id. at 13-21. On June 3, 2003, Mr. Paul wrote that "[w]e need to get the paper work in order ASAP or we may be told to cut off the service." App. 8.[5] On June 9, 2003, Mr. Paul wrote that "[i]f we do not have purchase orders and airtime agreements in place by Friday (retroactive to June 1) then we will likely have to 'bar' the satellite equipment from the system. . . . We cannot continue to leave the spigot open." App. 9.[6]

---

[5] Page 8 of the appendix (T00008) reflects a communication from Mr. Paul to Mr. Gray regarding the DART pilot program. App. 22 at 16-22.

[6] Page 9 of the appendix (Defendant's Exhibit 2) reflects a communication from Mr. Paul to Mr. Gray regarding the terminals. App. 23 at 12-22.

## ARGUMENT

I. The Government Is Entitled To Summary Judgment Because, Through Reasonable Efforts, Telenor Could Have Avoided The Alleged Damages That It Seeks To Recover

The Government is entitled to summary judgment because Telenor, through reasonable efforts, could have avoided the alleged damages that it seeks to recover. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Summary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action, Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987), and of avoiding an unnecessary trial when the movant is clearly entitled to judgment as a matter of law. Quad Envtl. Techns. Corp. v. Union Sanitary Dist., 946 F.2d 870, 872 (Fed. Cir. 1991).

Telenor alleges that it lent satellite communications terminals to the Government for a two-month DART pilot program, and that the Government owes it for using the terminals without permission after the pilot program ended. Compl. ¶¶ 1, 10. A party, however, cannot recover damages for loss that it could have avoided by reasonable efforts. Indiana

Michigan Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005). Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected to stop his own performance to avoid further expenditure. Restatement (Second) of Contracts § 350 cmt. b (1981). The non-breaching party is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss. Id. The amount of loss that the non-breaching party could reasonably have avoided by stopping performance is subtracted from the amount that would otherwise have been recoverable as damages. Id.

By taking reasonable efforts, Telenor could have turned off the terminals at any time, preventing their use and avoiding all of the loss that it alleges in this action. Telenor claims that the pilot program ended on May 11, 2003 (App. 31), and seeks $378,660.89 for service provided through its terminals from that date to June 10, 2003. Compl. at 7 ¶ 1; Compl. Exhibit B, p. 2. However, on June 10, 2003, Telenor directed its staff to "bar" the terminals. App. 10. Less than an hour later, Telenor's staff reported that the barring of the terminals was complete. Id. Once the terminals were barred, they could not be used. App. 39 at 11-14. Indeed, Telenor admits that it deactivated the terminals on June 10, 2003.

App. 28. That evidence establishes that, merely by taking reasonable efforts, Telenor could have prevented any post-program use of the terminals by simply turning them off when the program ended.

Telenor left the terminals operational after May 11, 2003, for business reasons unrelated to the DART pilot program. As early as May 9, 2003, Telenor suspected that the terminals were being used for purposes other than the DART pilot program. See App. 5. At the beginning of the pilot program, Telenor had monitored the use of the terminals every two weeks (see App. 13) and, on May 8, 2003, it obtained updated traffic numbers reflecting the use of the terminals. App. 5. The next day, after being informed that the military may have been using the terminals to telephone their families, and that such use might not be "in the spirit" of the pilot program, Telenor considered ending the pilot program. See id.

Instead, Telenor decided to keep the terminals operational because it believed that the Government might purchase them; but rather than turn the terminals off until they were purchased, Telenor left "the spigot open" in order to enhance the possibility that the Government would buy them. See App. 8-9; 39 at 16-19; 40 at 1-8. Eventually, Telenor turned the terminals off, concluding that it could not afford to wait for the Army to buy them.

See App. 40 at 13-21. However, because Telenor could have simply shut the terminals off on May 11, 2003, it cannot recover as damages any of the $378,660.89 that it seeks for use of the terminals from May 11 through June 10, 2003, the only period for which it seeks recovery in this action.

## CONCLUSION

Because, for the foregoing reasons, Telenor could have avoided by reasonable efforts the damages that it alleges in this action, the Government respectfully requests that the Court enter judgment in this action in favor of the Government.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

OF COUNSEL:
ONA M. HAHS
Attorney-Adviser
Department of State
Attorneys for Defendant

October 31, 2006

Certificate of Filing

I hereby certify that on November 1, 2006, a copy of the foregoing Defendant's Motion For Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail